UNITED STATES of America, Appellee,

v.

George REED, Paul Sheary, Johnathan Riebli, Thomas Schenk, Peter Miller, Appellants.

No. 82–2447.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 12, 1983.

Decided April 13, 1984.

Michael H. Metzger, Sausalito, Cal., for appellant Peter John Miller.

Judd C. Iversen, San Francisco, Cal., for Jonathan Riebli.

Daniel R. Marlowe, Oakland, Cal., for George Reed and Thomas Schenk.

Robert G. Turner, Houston, Tex., for Paul Sheary.

Thomas E. Dittmeier, U.S. Atty., Michael W. Reap, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before LAY, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and BRIGHT, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Defendants George Reed, Paul Sheary, Johnathan Riebli, Thomas Schenk, and Peter Miller appeal their convictions for possessing marijuana with intent to distribute and conspiracy to distribute marijuana. 21 U.S.C. §§ 841(a)(1) and 846. Their convictions stemmed from the DEA's seizure, while executing search warrants, of 8½ tons of marijuana found on the premises of a St. Louis Construction Company called the Chi-Del-Yans Corp. ("C.D.Y.") and inside three rental trucks seen leaving C.D.Y. premises.

As grounds for reversal, defendants Sheary, Riebli, Schenk, and Reed claim the trial court clearly erred in finding that probable cause and exigent circumstances justified the initial warrantless entry onto C.D.Y. premises; they accordingly claim the marijuana and other evidence gathered at C.D.Y. should have been suppressed as the product of this warrantless entry. Reed also contends the trial court erred in failing to suppress the marijuana found in the truck he was driving; he claims the initial stop of the truck amounted to a warrantless arrest, supported by neither probable cause nor exigent circumstances. Miller separately contends the trial court abused its discretion in failing to grant his severance motion since the other defendants presumably were willing to testify, at a separate trial, that Miller was not present at C.D.Y. when the marijuana was loaded. All defendants claim the trial court erred in not granting their motions for dismissal because of preindictment delay. We reject all of defendants' claims and affirm their convictions.

## I. *Facts*

### A) *Searches and Seizures*

The relevant facts concerning the searches and seizures were brought out during rather lengthy and exhaustive pretrial suppression hearings before a United States Magistrate. Much of the suppression hearing testimony consisted of government agents' accounts of information and events detailed in DEA Agent Sawyer's

search warrant affidavit. The C.D.Y. ultimately became the focus of a two year long DEA—St. Louis Police Department Task Force investigation into the drug trafficking activities of Anthony Clay Olivastro, Steven Meoli, Steven Nuelle and Thomas Cabrera—all members of a group called "Olivastro". In 1978 and 1979, Detective Charles Richmond, operating undercover, infiltrated "Olivastro", made numerous drug purchases from Nuelle and Meoli, and learned that Olivastro, Meoli, and Nuelle were involved in a large scale marijuana distribution in the St. Louis area. In late January, 1980, Olivastro told Richmond that his narcotics source was in Florida.

On January 29, 1980, confidential informant # 1 told the DEA that Nuelle was travelling to Fort Lauderdale, Florida in a rented Winnebago motor home to obtain controlled substances. Task force agents followed up on this tip and through independent investigation confirmed that Meoli and Nuelle drove a Winnebago from St. Louis en route to Florida. The task force then decided to begin continuous, intensified surveillance of Meoli, Nuelle, Cabrera and Olivastro. Throughout this undertaking, up until the search of C.D.Y. on February 7, all task force agents maintained common radio communication and were advised of events as they occurred.

On February 1, 1980, task force surveillance and investigation revealed that Nuelle, Meoli, Olivastro, and Cabrera arrived at the St. Louis airport on a flight from Fort Lauderdale, Florida. They drove to the nearby Sheraton Westport Inn, where Cabrera reserved a room. About this time, confidential informant # 1 told agents that the drug shipment was coming to the St. Louis area but that its arrival was delayed because of bad weather. This was confirmed by Detective Richmond, who reported that Olivastro told him that a large marijuana shipment was expected to arrive in East St. Louis, Illinois.

On the same day, Meoli and Cabrera rented a U-Haul truck and parked it in the Sheraton Westport Inn parking lot. On February 3, 1980, Detective Stolte saw a person later identified as defendant Peter Miller assist Meoli in attempting to start the U-Haul truck in the Sheraton Westport Inn parking lot. Miller and Meoli conversed for about an hour and ten minutes. The next day, February 4, 1980, Miller returned to Sheraton Westport Inn parking lot, driving a white over blue Mercury Cougar automobile. He met a person later identified as Robert Blair, who was driving a Ryder rental truck bearing Missouri license plates (Missouri Ryder). After a brief exchange, Miller parked the Cougar and Blair parked the Missouri Ryder near the U-Haul rented by Meoli.

On February 5, 1980, Special Agent Terry Sawyer saw the Missouri Ryder truck leaving the Sheraton Westport Inn. He followed the Missouri Ryder as it travelled to the nearby San Antonio Inn. The Missouri Ryder was parked next to a Ryder rental truck with Colorado license plates (Colorado Ryder) and near the previously seen white over blue Mercury Cougar. The Colorado Ryder was later driven from the San Antonio Inn, but surveillance was broken off.

On February 6, 1980, the informant told agents that the Olivastro group would return one of its rental trucks to the rental agency and use another truck parked at a motel in North St. Louis County to transport the marijuana. He further advised agents that the marijuana distribution site was to be in St. Louis, Missouri rather than in Illinois. Later that day, a DEA agent saw James Patrick Herman following a Ryder rental truck from the Holiday Inn in North St. Louis County to a rental agency. Just one week earlier, Herman had been convicted on drug charges in Georgia. The returned rental truck had been rented in the name of Thomas Cabrera. Herman and the driver of the returned rental truck then went to the residence of Anthony Olivastro.

During the evening of February 6, surveillance agents again sighted the Colorado Ryder, the Missouri Ryder, and the white over blue Mercury Cougar, this time parked next to each other in the Holiday

Inn parking lot. The agents also noticed that near the Missouri Ryder there were two other Ryder trucks, one with Oklahoma license plates and the other Pennsylvania plates.

Later that evening, the Oklahoma Ryder was driven from the Holiday Inn, and Officers Jones and Zambo followed it to the C.D.Y. Corp., a St. Louis construction company. This was the first time the task force became aware of the C.D.Y. The business premises of C.D.Y., located in a semi-commercial area, consists of a building bound on three sides by public streets. The building contains a basement warehouse with a rear overhead door that opens onto a truck loading area and back parking lot. The back parking lot, with dimensions running approximately 120 feet by 75 feet, is bound on the east and south sides by a chain link fence. Public entrance to the parking area is through an open 18′4″ wide gate on the south side of the lot, next to a public street. On the west side of the lot, there is a separate fence running adjacent to a carpet business.

When Officers Jones and Zambo arrived at C.D.Y. they noticed the Colorado Ryder truck backed up to the rear overhead door. Using binoculars, they continued their surveillance of C.D.Y.'s back lot from their automobile, parked on the adjacent street east of the lot. The lot was lit by a dusk-to-dawn light and by the street lights. At approximately 10:00 p.m., Officer Jones saw an individual later identified as Thomas Schenk leave the C.D.Y. building, enter the Colorado Ryder truck, drive it away from the rear overhead door, leave the truck, and then return to the C.D.Y. building. Later that night two other men were seen entering the C.D.Y. building.

At approximately 4:00 a.m. on February 7, Agent Pyla, who was supervising the surveillance, contacted an Assistant United States Attorney by telephone to advise him of what had occurred. The U.S. Attorney directed the investigation to continue, but advised that if circumstances at C.D.Y. changed—i.e., if it appeared that contraband or evidence would be lost—to secure the premises pending issuance of search and arrest warrants. At 6:30 a.m., the surveillance Officers Jones and Zambo saw the Colorado and Oklahoma Ryder trucks leaving the C.D.Y. premises. DEA Agent Stoddard and several other agents followed both trucks as they travelled north on Lindberg Road. The Oklahoma truck turned into the Holiday Inn North and the Colorado truck turned into the nearby San Antonio Motel parking lot. Stoddard watched the driver of the Colorado truck, defendant Schenk, park the truck and get into another Ryder rental truck, this one bearing a Missouri license, and driving it south on Lindberg Road in the direction of C.D.Y. Stoddard continued his surveillance of the Colorado rental truck until 6:00 p.m. that evening, when he entered it to execute a search warrant.

Shortly after the Colorado and Oklahoma Ryder trucks left C.D.Y., Officers Jones and Zambo, still surveilling C.D.Y.'s rear parking lot, saw a Budget Rent-A-Truck, bearing a Missouri license plate, enter the C.D.Y. loading area and back up to the garage door. The officers then observed the driver of the Budget Rental truck, later identified as defendant Reed, and two other individuals, later identified as defendants Riebli and Sheary, load large brown cardboard boxes onto the rear of this truck. At approximately 7:15 a.m., Officers Jones, Zambo, and Simpson watched Reed drive the Budget rental truck from C.D.Y. premises. At about the same time, the agents saw another Ryder rental truck bearing a Missouri license plate arrive at C.D.Y. Fearing that substantial amounts of marijuana were being transported away from C.D.Y., the task force agents—including Sawyer, Wells, Jones, Simpson and Zambo—decided to: (1) halt and secure the rental trucks seen leaving C.D.Y., (2) secure the C.D.Y. premises, and (3) detain suspects at C.D.Y. pending search warrant applications. Agent Sawyer testified that these measures were to be accomplished without searching the trucks or C.D.Y. At the time, the agents did not know the identity or number of individuals inside the C.D.Y.

Officers Jones and Simpson stopped the Reed driven Missouri Budget rental shortly after it left C.D.Y.. The officers believed the truck contained a load of marijuana. As Jones approached the truck, he saw, through the open door between the passenger compartment and the cargo area, several large cardboard boxes standing up right in the rear of the truck. Jones identified himself as a police officer and asked Reed if he would cooperate in answering some questions. Reed agreed and stepped out of the truck, leaving the door open. As Reed got out, Jones smelled what he believed to be marijuana coming from the truck. While questioning Reed, Jones looked in the open door of the truck and saw a partially open box appearing to contain a wrapped bale of marijuana. At this point, Jones advised Reed that he was under arrest. After talking to Special Agent Sawyer, Jones transported Reed to the Breckenridge Hills Police Department. While executing a subsequently obtained search warrant, agents discovered and seized 705 pounds of marijuana from the Budget rental truck.

While Officer Jones was stopping Reed, Detective Larry Wells drove his car through the open gate into the rear parking lot of C.D.Y. He immediately saw, from 20 yards away, three individuals, later identified as defendants Schenk, Sheary, and Riebli, unloading a Ryder rental truck that was backed up to the warehouse door. Riebli spotted Wells and yelled very loudly "here come the cops". As Wells got out of his car and identified himself, the three suspects ran inside the C.D.Y. building. Wells chased Schenk into the premises and arrested him on the first floor hiding behind a bathroom door. When Wells initially entered the rear warehouse area of C.D.Y., he noticed several large boxes and loose marijuana debris scattered on the floor. He could also smell marijuana. While Wells chased Schenk inside C.D.Y., Special Agent Sawyer saw Riebli and Sheary run from the front door. Sawyer caught up with them a quarter of a mile from C.D.Y. and arrested them. The defendants were then taken to the Breckenridge Hills Police Station.

After Detective Jones returned to C.D.Y. from the Breckenridge Hills Police Department, he saw the white over blue Mercury Cougar pull into the C.D.Y. back parking lot. Jones was aware that the car had been seen near Meoli's U-Haul, and the Oklahoma and Colorado Ryders. Jones also recognized the driver, defendant Miller, from an earlier description given by Detective Stolte, who had seen Miller meet Meoli at the Sheraton Westport Inn. As Miller sighted Detective Jones, Miller reversed his entry. Detective Jones and Agent Sawyer stopped and arrested Miller. In doing so, Jones saw a brown handbag on the rear floorboard of the automobile and seized it. Miller told Jones that it contained money. In fact it contained $7,500.00.

After defendants were arrested, Agent Sawyer applied for search warrants for the C.D.Y. premises, the Budget rental truck, the Oklahoma, Colorado, and Missouri Ryder trucks, and the Mercury Cougar. Agent Sawyer's eight page affidavit detailed most of the foregoing facts, from the informant's tip about the expected marijuana shipment to the arrests at C.D.Y. The warrant also included information obtained from the Breckenridge Hills Police Department that Nathaniel Yancy obtained a merchant's license for the C.D.Y. Corp. Yancy had been arrested at C.D.Y. on the morning of February 7. The Breckenridge Hills Police Department also advised DEA agents that James Herman, the individual convicted on drug charges who had been seen following the Olivastro rental truck, was the manager of C.D.Y.. The affidavit also included information from confidential informant # 2, who had infiltrated "Olivastro" and had provided reliable information in the past two weeks. The informant stated that he had been approached by Olivastro for assistance in smuggling large quantities of marijuana into the United States and that a large marijuana shipment was expected in St. Louis.

The search warrants' execution revealed marijuana in the following gross weights: 8,692 pounds at C.D.Y., 6,309 pounds in the Colorado Ryder, 2,990 pounds in the Oklahoma Ryder and 705 pounds in the Budget Rental truck. The Colorado Ryder was rented in the name of Thomas Schenk. The Oklahoma Ryder was rented in the name of George Reed and the Missouri Ryder was rented in the name of Robert Blair. The search of the Mercury Cougar, which was rented in the name of Robert Blair, included the following items introduced against Miller at trial: a brown purse with $7,500 in it, an airline ticket in Miller's name for January 29, 1980 to Fort Lauderdale, Florida, a red wallet with defendant Sheary's driver's license, and a small black address book with phone numbers of the other defendants and co-indictees Robert Blair and Nathaniel Yancy. Also, a beer bottle with Peter Miller's fingerprints on it was found inside C.D.Y..

Defendants filed pre-trial motions to suppress the evidence gathered in C.D.Y. and rental trucks, as the product of unlawful searches and seizures. The district court, adopting the magistrate's findings and recommendations, denied these motions. The magistrate found that surveillance Officer Wells' initial warrantless entry onto C.D.Y. to "secure the premises" was justified by: 1) probable cause to believe C.D.Y. was a focal point for marijuana distribution, and 2) exigent circumstances—i.e., the risk of loss or removal of the marijuana. The magistrate further found that Officer Wells had probable cause to arrest defendants Riebli, Schenk, and Sheary when they fled upon sighting Wells; and, Wells' eventual warrantless entry inside C.D.Y., where he saw and smelled marijuana, was proper since he was in "hot pursuit" of the fleeing defendants. Finally, the magistrate found that the officer's stop of the Reed driven Budget rental truck was a legitimate investigatory *Terry*-type stop; during that legitimate stop, the officers observed marijuana in plain view, giving them probable cause to arrest Reed and search the truck.

B) *Indictments and Trial*

A criminal complaint was filed against defendants on February 7, 1980, the day they were arrested. These charges were dropped around February 10, 1980, to protect the identity of Detective Richmond and the two informants, who had infiltrated the "Olivastro" group and were involved in the ongoing investigation of that group.

Ultimately, the "Olivastro" members were indicted and tried in October, 1980. On April 1, 1982, the defendants and Nathaniel Yancy and Robert Blair were indicted for possession with the intent to distribute and conspiracy to distribute the marijuana seized on February 7, 1980. Prior to trial, Robert Blair died by an apparent suicide. Yancy pled guilty and, pursuant to the plea agreement, gave testimony against defendants.

At trial Yancy testified, over defendants' objection, that in late January, 1980, he and his long time friend Roosevelt Becton (a.k.a. "Patch") went to Florida to acquire marijuana. Yancy identified a fishing trip photo taken during this Florida trip. Nuelle, Olivastro, Yancy, Becton, and defendant Riebli were depicted in the photo. Yancy testified that Becton had introduced him to Olivastro some five or six years prior to 1980. Yancy further testified that just prior to the Florida trip he had met defendant Riebli through defendant Sheary, whom Yancy had known for several years. While in Florida, Sheary introduced Yancy to defendants Miller, Reed, and Blair. Yancy had also known Schenk for several years.

Yancy testified that although he and Becton were unable to acquire marijuana while in Florida, Becton instructed him that a large marijuana shipment would be sent to St. Louis from Florida. Yancy agreed to store the expected shipment at C.D.Y. Sheary called Yancy on February 6, 1980 to tell him that the marijuana shipment had arrived. According to Yancy, that evening Sheary drove a tractor trailer containing 8½ tons of marijuana to C.D.Y. Sheary supervised the unloading and reloading of the marijuana at C.D.Y. Yancy claimed

that defendants Riebli, Reed, Miller, and Schenk were all involved in unloading and reloading the marijuana at C.D.Y..

After Yancy testified concerning Miller's involvement in loading marijuana at C.D.Y., Miller moved for severance, supported by Miller's attorney's declaration that the other defendants would testify that Miller was not within the C.D.Y. premises during the loading and reloading of the marijuana. In court, out of the jury's presence, the defendants stated that they would testify on Miller's behalf at a separate trial. The trial court denied the severance motion on the grounds that there was substantial evidence linking Miller to the conspiracy which the proffered testimony would not contradict.

II. *Search and Seizure Issues*

A) C.D.Y.

Defendants claim that the marijuana and other evidence found inside C.D.Y. and the rental trucks should have been suppressed as the product of Officer Wells' initially unlawful warrantless entry onto C.D.Y.'s back parking lot. They contend the magistrate clearly erred in finding that Officer Wells had probable cause to believe C.D.Y. contained marijuana and that the risk of its removal from C.D.Y. premises provided a sufficient exigency to justify Wells' warrantless entry. They further suggest that their criminally suggestive actions upon sighting Officer Wells—i.e., yelling "here come the cops" and fleeing inside C.D.Y.—was the product of Wells' initially unlawful entry and thus could not be used to establish the necessary probable cause and exigent circumstances to justify the entry inside C.D.Y. to arrest the defendants.

As a threshold matter, we think it appropriate to consider whether Officer Wells' initial warrantless entry onto C.D.Y.'s back parking lot constituted a Fourth Amendment "search", triggering the probable cause and exigent circumstances requirements.[1] If it did not, then the defendants' criminally suggestive behavior upon sighting Wells may properly be considered along with the totality of other facts and circumstances known to the surveillance officers in determining whether probable cause and exigent circumstances justified the Officer Wells' entry inside C.D.Y. to arrest defendants and to secure the premises. Our review of the applicable law and the record, including the magistrate's findings, convinces us that defendants did not entertain a legitimate expectation of privacy in C.D. Y.'s back parking lot; therefore, Officer Wells' entrance into that area did not constitute a Fourth Amendment search.[2]

A Fourth Amendment search occurs when the government invades an area in which a person entertains a legitimate or justifiable expectation of privacy. *Rakas v. Illinois,* 439 U.S. 128, 143, & n. 12, 99 S.Ct. 421, 430, & n. 12, 58 L.Ed.2d 387 (1978); *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967). *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968). Although *Katz* recognized that the Fourth Amendment "protects people, not places", it is still necessary to consider the nature of the place—whether private or public, residential or commercial—in which legitimate privacy expectations are being asserted. *Katz,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J. concurring). W. LaFave, *Search and Seizure,* § 2.3 at p. 291 (1978);

1. A warrantless search or seizure is reasonable when justified by both probable cause and exigent circumstances. *Warden v. Hayden,* 387 U.S. 294, 298, 87 S.Ct. 1642, 1645, 18 L.Ed.2d 782 (1967).

2. The magistrate did not specifically address this question but simply found that even if the initial warrantless entry was a Fourth Amendment search, it was proper since Officer Wells had probable cause to believe C.D.Y. contained marijuana and reasonably feared the marijuana would be removed unless he secured the premises immediately; thus, since this initial entry was itself considered a lawful search, the defendants' criminally suggestive behavior, which gave Wells probable cause to arrest them, was not the product of any prior illegality. Though we do not regard these findings as clearly erroneous, we nevertheless believe an analytically sound and judicially pragmatic starting point would be to consider whether Officer Wells' initial entry even violated defendants' Fourth Amendment rights.

*see also Rakas,* 439 U.S. at 143–44 n. 12, 99 S.Ct. at 430–31 n. 12; *United States v. Santana,* 427 U.S. 38, 42, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976). For instance, as Justice Harlan noted in *Katz,* 389 U.S. at 361, 88 S.Ct. at 516, "a man's home is, for most purposes, a place where he expects privacy ..." *See also Santana,* 427 U.S. at 42, 96 S.Ct. at 2409; LaFave, *id.,* § 2.3 at pp. 290–91. On the other hand, as one commentator has remarked, "[i]t is a fair generalization ... that business and commercial premises are not as private as residential premises, and that consequently there are various police investigative procedures which may be directed at such premises without the police conduct constituting a Fourth Amendment search." LaFave, *id.,* § 2.4(b) at pp. 338–39; *see also United States v. Brandon,* 599 F.2d 112, 113 (6th Cir.1979), *cert. denied,* 444 U.S. 837, 100 S.Ct. 72, 62 L.Ed.2d 47 (1980). Similarly, courts have recognized no Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors—such as driveways, walkways, or similar passageways. LaFave *id.* § 2.3 at pp. 322–23; *United States v. Ventling,* 678 F.2d 63, 66 (8th Cir.1982) (no legitimate privacy expectation in residential driveway accessible to and from public highway); *United States v. Magana,* 512 F.2d 1169, 1171 (9th Cir.1975); *United States v. Edmonds,* 611 F.2d 1386, 1388 (5th Cir.1980) (no legitimate privacy expectation in loading dock/parking lot area of business premises). Underlying these decisions is *Katz's* teaching that, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not the subject of Fourth Amendment protection". 389 U.S. at 351, 88 S.Ct. at 511.

Applying these Fourth Amendment principles, it is clear that Officer Wells' initial entry into the fenced but open back parking lot of C.D.Y. did not invade defendants' reasonable expectation of privacy. As the magistrate found, C.D.Y., a construction company, was located in a commercial area and was bound on three sides by public streets; the parking lot and loading area were visible from the streets on the east and south side; and the fenced gate to the lot was completely open, providing a 18′ 4″ wide access path to and from the public street located immediately south of C.D.Y. *Cf., Edmonds,* 611 F.2d at 1388; *Ventling,* 678 F.2d at 66. Furthermore, there was no indication that the back parking lot was "private" to the owners or to those specifically authorized to use it. *Cf., id..* In fact, suppression hearing testimony indicated that the back lot served as a common loading area for C.D.Y. and a carpet business located to the immediate west of C.D.Y. We conclude that, at most, the back lot was a "semi-private area"; it certainly was not an area in which defendants had a reasonable expectation of privacy. *Cf., Magana;* 611 F.2d at 1388.

Our analysis is not altered by the fact that Officer Wells' entry onto C.D.Y.'s back parking lot may have been prompted by a desire to secure the premises and detain those on the premises pending the issuance of the search warrant. Whether a police officer has commenced a "search" turns not on his subjective intent to conduct a search and seizure, but rather whether he has in fact invaded an area which the defendant harbors a reasonable expectation of privacy. *See Terry v. Ohio,* 392 U.S. at 9, 88 S.Ct. at 1873 (1968); *cf., United States v. Mendenhall,* 446 U.S. 544, 554 n. 6, 100 S.Ct. 1870, 1877 n. 6, 64 L.Ed.2d 497 (Stewart, J.) (1980) (officers intention to detain subject irrelevant to whether reasonable person would believe he was being seized). Furthermore, despite Officer Wells' intention ultimately to detain suspects at C.D.Y. pending warrant issuance, his initial entry itself clearly did not constitute a full blown custodial or traditional arrest requiring probable cause. *See Dunaway v. New York,* 442 U.S. 200, 206–216, 99 S.Ct. 2248, 2253–58, 60 L.Ed.2d 824 (1978); *Michigan v. Summers,* 452 U.S. 692, 698–700, 101 S.Ct. 2587, 2592–93, 69 L.Ed.2d 340 (1981); *see also United States v. Chaffen,* 587 F.2d 920, 923 (8th Cir.1978) ("to constitute an arrest, there must be an actual or constructive seizure

or detention of the person, performed with the intention to effect an arrest and so understood by the person detained[;]" officer's subjective intention to conduct arrest not dispositive.); *United States v. Beck,* 598 F.2d 497, 500 (9th Cir.1979); *United States v. Johnson,* 626 F.2d 753, 755 (9th Cir.1980). Finally, it is highly doubtful that Officer Wells' initial entry even rose to the level a limited *Terry* -type detention. *See United States v. Pajari,* 715 F.2d 1378, 1381 (8th Cir.1983); *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877 (Stewart, J.); *see also Terry,* 392 U.S. at 16, 88 S.Ct. at 1877. Specifically absent here were the necessary indicia of physical force or coercion—such as the threatening presence of several officers, the display of a weapon, physical touching, or the use of authoritative language—to cause a reasonable person, innocent of any crime, to believe that his liberty was being restrained. *Id.; Terry,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16; *compare Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). However, as will be seen from the discussion below, even if the initial entry constituted a *Terry* -type detention, it was clearly justified since Officer Wells had, at the very least, reasonable, articulable suspicion that defendants were involved in the unlawful distribution of marijuana.[3] *Terry,* 342 U.S. at 21, 88 S.Ct. at 1879; *United States v. Brignoni-Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975).

■ When defendants' criminally suggestive behavior upon sighting Officer Wells is considered in the context of all of the other information known to the surveillance team, there can be little doubt that probable cause and exigent circumstances justified the warrantless entry inside C.D.Y. to arrest the fleeing defendants and to secure the premises. Probable cause to make a warrantless arrest exists where the facts and circumstances within the collective knowledge of law enforcement officials, and of which they had reasonably trustworthy information, were sufficient to warrant a prudent person to believe that the suspect has committed or was committing an offense. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *United States v. Wallraff,* 705 F.2d 980, 990 (8th Cir.1983). Furthermore, as the Supreme Court has frequently and recently emphasized: "In dealing with probable cause ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act". *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949); *see also Adams v. Williams,* 407 U.S. 143, 149, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1970); *Illinois v. Gates,* 462 U.S. 213, ——, 103 S.Ct. 2317, 76 L.Ed.2d 527, 544 (1983). And, "[i]t is clear that 'only the probability and not a prima facie showing, of criminal activity is the standard of probable cause.'" *Gates,* 462 U.S. at ——, 103 S.Ct. at 2330, 76 L.Ed.2d at 546, *quoting Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969).[4]

■ The magistrate found that even prior to Officer Wells' entry the surveillance officers had reasonable grounds to believe that C.D.Y. was the focal point for unlawful marijuana distribution and that unless the premises were immediately secured large amounts of marijuana would be lost

3. For convenience, the discussion of facts giving rise to Wells' reasonable suspicion are subsumed in the discussion of facts giving him probable cause to arrest defendants.

4. Despite defendants' suggestion, there is no binding authority for the proposition that warrantless searches and arrests require a higher showing of probable cause than do those conducted with warrants. *See Draper v. United States,* 358 U.S. 307, 310–11, 79 S.Ct. 329, 331, 3 L.Ed.2d 327 (1959); *Whiteley v. Warden of Wyoming Penitentiary,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). *See also United States v. Briley,* 726 F.2d 1301 (8th Cir.1984) (court applies *Gates* "totality of circumstances" approach in determining whether probable cause existed for warrantless arrest); *United States v. Mendoza,* 722 F.2d 96, 100 & n. 5 (5th Cir.1983); LaFave, *id.,* § 3.1 (1984 Supp.) (*Gates* probable cause standard applies in no warrant situations).

as evidence. It is difficult to characterize these findings as clearly erroneous.[5] The surveillance team was aware of a rather impressive string of facts and circumstances which, when considered collectively, indicated a fair probability that C.D.Y. was the site for unlawful marijuana distribution. Specifically, the surveillance team had learned, from its own undercover officer and a confidential informant, that Olivastro was expecting a very large marijuana shipment from Florida. The distribution site was to be in St. Louis County. On February 3, 1980, agents saw Meoli, an Olivastro member, rent a U-Haul truck and drive it to the Sheraton Westport Inn, a St. Louis hotel where other Olivastro members had met. Agents saw Meoli and defendant Miller, the driver of a white over blue Mercury Cougar, attempt to start the Meoli U-Haul. The next day, the Mercury cougar returned to the Sheraton parking lot and the driver, Miller, met defendant Robert Blair, who was driving a Missouri Ryder truck. The Cougar and Missouri Ryder were parked very near the Meoli U-Haul. On February 5, agents followed the Missouri Ryder to the nearby San Antonio Inn. There the Missouri Ryder was parked next to a Colorado Ryder and the earlier seen Mercury Cougar. On February 6, as the confidential informant had predicted, a rental truck rented in the name of Thomas Cabrera (an Olivastro member) was returned to a rental agency. James Patrick Herman, who had been previously convicted on drug charges, followed the rental truck. The truck had been parked at the Holiday Inn in North St. Louis County. The informant told agents that another truck parked at a North St. Louis County hotel would be used to transport marijuana from a distribution site somewhere in St. Louis, Missouri. That evening, agents saw the Missouri Ryder, Colorado Ryder, and white over blue Mercury Cougar parked next to each other in the Holiday Inn in North St. Louis County. An Oklahoma Ryder was also parked next to these trucks and car. Pursuant to the informant's tip, the agents decided to follow the Oklahoma Ryder as it left the Holiday Inn. They followed it to C.D.Y., where they noticed that the Colorado Ryder was already backed up to the warehouse door. The agents observed various loading activities going on at C.D.Y. throughout the night. At about 6:30 a.m. on February 7, the Oklahoma and Colorado Ryders left C.D.Y. and the Reed driven Missouri Budget rental truck arrived. Defendants Reed, Riebli, and Sheary quickly loaded large cardboard boxes onto the rear of this truck. As the Budget truck left, the surveillance agents, believing that marijuana was being transported from C.D.Y., decided to halt the various trucks and secure C.D.Y. premises.

Although at first blush the preceding factual sequence seems somewhat tortuous, it nevertheless provides crucial, logical links between the expected drug shipment and C.D.Y.. Most notably, the Oklahoma Ryder was followed to C.D.Y. from the North St. Louis County Hotel Holiday Inn lot, where it had been parked next to the Missouri Ryder and Mercury Cougar. Both the Missouri Ryder and Cougar had been parked at the Sheraton Westport Inn near the U-Haul rented by Meoli. At the Sheraton, the driver of the Cougar, defendant Miller, had brief conversations with both Meoli and the driver of the Missouri Ryder, defendant Blair. The Colorado Ryder at C.D.Y. had also been seen at the Holiday Inn and Sheraton lots parked next to the Missouri Ryder and Cougar. The Cabrera rental truck had previously been driven from the same Holiday Inn lot to the rental agency. These events corroborated the informant's tip that Olivastro would return a rental truck parked in a St. Louis County hotel lot and use another rental truck from the same lot for transporting the marijuana from the distribution site in St. Louis, Missouri. Finally, that brisk loading activity involving the large rental

5. As the parties agree, we review the district court's findings regarding probable cause and exigent circumstances to make a warrantless arrest or search under the clearly erroneous standard of review. *United States v. Wallraff*, 705 F.2d 980, 987 (8th Cir.1983); *United States v. Williams*, 604 F.2d 1102, 1121 (8th Cir.1979).

trucks was occurring between 4:00 and 5:30 a.m. at C.D.Y., a small construction company, naturally lended credence to the officers' belief that they had located the marijuana distribution site.

Additional circumstances indicated that the officers were facing a very fluid and volatile situation, requiring immediate police action to prevent the possible loss of marijuana and the escape of suspects. Specifically, three large rental trucks thought to contain marijuana had departed C.D.Y. and a fourth truck had arrived within a very short period of time. The officers also knew that at least three and perhaps more unidentified suspects were inside C.D.Y. Given these circumstances, we cannot say the magistrate clearly erred in finding there was probable cause and a sufficient exigency to justify halting the rental trucks and securing C.D.Y. premises pending issuance of the search warrant. *See United States v. Blake,* 484 F.2d 50, 54–55 (8th Cir.1973) (risk of imminent removal or loss of unlawful narcotics constitutes exigency sufficient to justify warrantless search); *United States v. Kulcsar,* 586 F.2d 1283, 1287 (8th Cir.1978).[6] We should add that the contemplated intrusion here was reasonably and narrowly designed to maintain the *status quo* pending warrant issuance, not to conduct a full blown warrantless search inside the trucks and C.D.Y.. Hence, the contemplated intrusion was to be "strictly circumscribed by the exigencies which justifi[ed] its initiation." *Terry,* 392 U.S. at 26, 88 S.Ct. at 1882; *citing Warden v. Hayden,* 387 U.S. 294, 310, 87 S.Ct. 1642, 1651, 18 L.Ed.2d 782 (1967); *see also Adams v. Williams,* 407 U.S. at 146, 148, 92 S.Ct. at 1924; *Michigan v. Summers,* 452 U.S. 692, 700 n. 12, 101 S.Ct. 2587, 2593 n. 12, 69 L.Ed.2d 340 (1981).

However, before the C.D.Y. premises were actually "secured", and thus before any Fourth Amendment "search" occurred, defendant Riebli saw Officer Wells coming through the open gate and yelled "here come the cops". Defendants Riebli, Sheary and Schenk then fled inside the building after Wells identified himself as a police officer. As the magistrate found, this criminally implicative conduct, considered in the context of all of the other known facts and circumstances, gave Officer Wells the probable cause to arrest the fleeing defendants,[7] and authorized his warrantless entry inside C.D.Y. since he was in "hot pursuit". *See Warden v. Hayden,* 387 U.S. at 298–300, 87 S.Ct. 1645–46; *United States v. Santana,* 427 U.S. at 42–43, 96 S.Ct. at 2409–10. While in hot pursuit, Officer Wells was permitted to conduct an exploratory sweep search of C.D.Y. to assure no one lay in waiting for him. *See Blasco,* 702 F.2d at 1326. Shortly after Wells chased the fleeing defendants inside the rear area of C.D.Y., he smelled marijuana and saw several boxes of marijuana debris scattered on the floor. Wells ultimately arrested Schenk inside C.D.Y. and Agent Sawyer arrested Riebli and Sheary as they were running away from C.D.Y.. These warrantless arrests were clearly proper.

Wells' plain view sighting and smelling of marijuana inside C.D.Y. was properly included in Agent Sawyer's affidavit in support of the search warrants for C.D.Y. and the four rental trucks seen at C.D.Y.; it was not the product of any prior police illegality. However, even excluding this information, Agent Sawyer's affidavit still provided the issuing magistrate with a "substantial basis ... for concluding" that there was probable cause to search C.D.Y. and the rental trucks for evidence of wrong doing. *Illinois v. Gates,* 462 U.S. at ——,

6. *See also United States v. Blasco,* 702 F.2d 1315, 1325–26 (11th Cir.1983); *United States v. Rubin,* 474 F.2d 262, 265–68 (3rd Cir.), *cert. denied,* 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973).

7. The observation of individuals fleeing upon police identification is a strong indication of *mens rea,* when coupled with other information known to officers. *See United States v. Sibron,* 392 U.S. 40, 66–67, 88 S.Ct. 1889, 1904–05, 20 L.Ed.2d 917 (1968); *see also United States v. Sanders* 631 F.2d 1309, 1312 (8th Cir.1980).

103 S.Ct. at 2331, 76 L.Ed.2d at 547; *see also United States v. Williams,* 633 F.2d 742, 745 (8th Cir.1980). The eight page affidavit carefully and exhaustively detailed the forementioned facts and circumstances gathered by the surveillance team. It also included independent information obtained from the Breckenridge Hills Police Department that James Patrick Henry was the manager of C.D.Y. Herman, who had been recently convicted on drug charges, was seen following the Cabrera rental truck from the North Holiday Inn to a rental agency and was seen at the home of Anthony Olivastro. The affidavit also included the tip of confidential informant # 2, who had been approached by Olivastro for assistance in smuggling marijuana into the United States. The informant stated that through direct conversations with Olivastro, he learned that Olivastro was a major drug distributor in St. Louis. He also learned that a very large shipment was soon coming to St. Louis, Missouri from Florida. This tip was consistent with what undercover agent Richmond and confidential informant # 1 had said; it was also verified by independent surveillance. We therefore conclude that the magistrate properly issued the search warrants for C.D.Y. and the rental trucks based upon the information contained in Agent Sawyer's affidavit; the evidence seized pursuant to those warrants was therefore admissible.

B) *Stop and Arrest of Reed*

Reed separately contends the magistrate clearly erred in finding that reasonable, articulable suspicion justified detectives Jones' and Simpson's stop of the Reed driven Budget Rental truck as it departed C.D.Y. He also suggests that since the officers intended ultimately to arrest him, the initial stop required probable cause. Finally, Reed takes exception to the magistrate's finding that Detective Jones saw a bale of marijuana in "plain view" during the stop.

Initially there can be little doubt that Detectives Jones and Simpson had at least reasonable, articulable suspicion that the truck contained marijuana. The detectives possessed the same information that Officer Wells and other surveillance officers did, pointing to C.D.Y. as a marijuana distribution site. They also observed Reed, Riebli, and Sheary load large boxes into the rear of the Budget Rental truck. Under the circumstances, it was reasonable and appropriate for the officers to stop the Budget Rental truck for the purpose of further investigation and brief questioning. *Adams v. Williams,* 407 U.S. 146–47, 92 S.Ct. at 1923–24; *United States v. Place,* — U.S. —, —, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110, 118 (1983); *United States v. Brignoni-Ponce,* 422 U.S. 873, 880, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975).

Furthermore, the record supports a finding that the initial stop and brief questioning of Reed, during which Officer Jones saw and smelled the marijuana, was "significantly less intrusive"—in manner, scope, and duration—than a "traditional", "formal", or "custodial arrest" requiring probable cause. *See Dunaway,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Michigan v. Summers,* 452 U.S. at 697–700, 702, 101 S.Ct. at 2594. Indeed, the initial stop here was no more instrusive than those investigatory stops upheld in *Terry,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889; *Adams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612, and *Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607. That the officers ultimately intended to arrest Reed does not by itself convert the initial investigatory stop into an arrest. *See Chaffen,* 587 F.2d at 923–24; *Beck,* 598 F.2d at 500.[8]

We are similarly unable to say the magistrate clearly erred in crediting Agent Jones' testimony that during the initial stop he saw an open box containing a bale of marijuana. We reject Reed's contention that "it was so highly unlikely" that just

8. It appears that when Officer Jones testified that he stopped Reed to arrest him he was referring to a detention of Reed while a search warrant was obtained to search the truck.

one box would be left open as to render Jones' testimony incredulous. The box may have been broken open by defendants in order to "sample" the contents or it may have opened accidentally during loading or transporting.

Finally, when Officer Jones saw and smelled the marijuana, he certainly had probable cause to arrest Reed and to search the truck and seize the marijuana. *Texas v. Brown,* 460 U.S. 730, ——, 103 S.Ct. 1535, 1540–43, 75 L.Ed.2d 502, 511–14 (1983); *Coolidge v. New Hampshire,* 403 U.S. 443, 465–68, 91 S.Ct. 2022, 2037–39, 29 L.Ed.2d 564 (1971); *United States v. Ross,* 456 U.S. 798, 800, 102 S.Ct. 2157, 2160, 72 L.Ed.2d 572 (1982). The search here was reasonable under the Fourth Amendment. And in any event, the marijuana was ultimately seized pursuant to the valid search warrant issued for the Budget truck. As mentioned above, Agent Sawyer's affidavit provided the magistrate with a substantial basis for concluding that evidence of contraband would be found in the four rental trucks, including the Missouri Budget rental truck.

III. *Preindictment Delay*

Defendants were arrested and charged on February 7, 1980 but the charges were dismissed shortly thereafter; they were indicted on April 1, 1982. Defendants claim the indictment should have been dismissed because the preindictment delay of some 26 months violated their Fifth Amendment due process rights. We reject this claim because defendants have not shown that the government intentionally delayed seeking an indictment to gain tactical advantage, resulting in actual, substantial prejudice to defendants' trial defense. *United States v. Lovasco,* 431 U.S. 783, 788–90, 97 S.Ct. 2044, 2047–48, 52 L.Ed.2d 752 (1977); *United States v. Marion,* 404 U.S. 307, 324–25, 92 S.Ct. 455, 465–66, 30 L.Ed.2d 468 (1971); *United States v. Boles,* 684 F.2d 534, 535–36 (8th Cir.1982).

First, as the magistrate properly found, the initial charges were dismissed to protect the integrity of an ongoing undercover investigation of the Olivastro group. Specifically, the government legitimately sought to protect undercover Detective Richmond and two DEA informants who had infiltrated Olivastro and had provided the information contained in Agent Sawyer's search warrant affidavit. Although the Olivastro defendants were indicted and tried on October 1, 1980, the additional pre-indictment delay was needed to follow up on numerous investigative leads stemming from the voluminous telephone toll records, documents and other physical evidence seized from C.D.Y. and the various vehicles. Given the enormous scope of the criminal activity involved here, such continuing investigation to determine whether other individuals might be involved seems entirely appropriate. *United States v. Auerbach,* 682 F.2d 735, 740–41 (8th Cir. 1982). Defendants completely failed to produce any evidence showing that the reason for the delay here was not to investigate but rather to gain a tactical advantage over defendants.

Further, the defendants failed to demonstrate that the delay substantially prejudiced their trial defense. Miller's contention that he was prejudiced by the suicide death of co-defendant Robert Blair, a purported would-be defense witness, is unavailing; Blair was never arrested and it is sheer speculation to suggest that he would have been available and willing to testify at an earlier trial. Finally, even assuming defendants may have suffered the gamut of financial, social, and emotional disabilities typically attendant post-indictment delay, this does not establish a due process violation; indeed any knowing target of a criminal investigation could make a similar claim. *See MacDonald,* 456 U.S. 1, 8–9, 102 S.Ct. 1497, 1502–03, 71 L.Ed.2d 696 (1982).

IV. *Evidence of Olivastro Associates*

All defendants, except Reed, renew their trial objection to the admission of evidence concerning the Olivastro associates and Roosevelt Becton. They claim the court

abused its discretion in permitting Yancy to testify that 1) in January, 1980, while on a marijuana purchasing trip in Florida, he and his cohort Becton met Olivastro, Meoli, and Nuelle; 2) Becton instructed Yancy that a marijuana shipment would be coming to St. Louis from Florida; 3) Yancy was to load three tons of marijuana for himself, Becton, and Olivastro. Defendants claim this testimony concerning the acts and hearsay statements of Olivastro associates was irrelevant, unfairly prejudicial, and lacking proper foundation since there was no independent showing that defendants and the Olivastro conspirators, including Becton, were part of a single conspiracy.

The trial court did not abuse its discretion in admitting Yancy's testimony regarding the Olivastro associates. First, the government showed by a preponderance of independent evidence that the named defendants and the unindicted Olivastro associates, including Becton, were all part of the same conspiracy involving the distribution of a large marijuana shipment in St. Louis. *United States v. Bell*, 573 F.2d 1040, 1044 (8th Cir.1978). Specifically, Yancy identified Exhibit 2, a fishing trip photo taken in Florida while Yancy and Becton were in pursuit of marijuana; Nuelle, Olivastro, Yancy, Becton, and defendant Riebli were all depicted in the photograph. Miller and Blair were also in Florida during this time. On February 1, 1980, surveillance officers saw Olivastro, Nuelle, Meoli and Cabrera at Lambert-St. Louis Airport. The officers also saw defendant Miller meet and assist Meoli in attempting to start a U-Haul parked at the Sheraton Westport Inn; Meoli and Cabrera had rented a room at the Sheraton as had Miller and Blair. Defendants Miller and Blair later parked vehicles next to the Meoli U-Haul. And on February 7, 1980, Meoli arrived at C.D.Y. shortly after defendants' arrest.

Furthermore, Becton's hearsay statements about the expected marijuana shipment and his association with Olivastro were made in furtherance of this single conspiracy involving defendants and therefore were properly admitted. *United States v. Handy*, 668 F.2d 407, 408 (8th Cir.1982). Any minor variance in proof from the conspiracy alleged in the indictment against defendants did not "affect the substantial rights of the [defendants]". *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Anderson*, 552 F.2d 1296, 1301 (8th Cir.1977). The testimony in dispute here did not purport to prove an entirely separate conspiracy in which defendants had no involvement. *See Anderson*, 552 F.2d at 1296. Finally, we find no merit in defendants' suggestion that they were prejudiced by limitations placed upon their cross-examination of Yancy.

### V. *Prejudicial Joinder of Miller*

At the commencement of trial Miller learned, allegedly for the first time, that Yancy would testify Miller was at C.D.Y. during the night of February 6 and the early morning of February 7 and participated in the marijuana loading operations, along with defendants Reed, Sheary, Schenk, and Riebli. Requesting a severance, Miller provided the sworn declaration of Schenk and the sworn statements of defendants Reed, Sheary, and Riebli[9] that they would testify, at a separate trial, that Miller was not on C.D.Y. premises during the loading operations of February 6 and 7. Miller claims this rebuttal testimony was critical to his defense since the other evidence linking him to the conspiracy was very weak and could not have sustained a verdict. The trial court, acknowledging that the proferred testimony of Miller's co-defendants "might rebut the testimony of Yancy", nevertheless denied severance because there was "other substantial evidence linking Miller to the conspiracy which the proffered testimony would not

9. The government stipulated that the statements of Reed, Sheary and Riebli were made under oath.

[contradict]." The trial court also emphasized the inconvenience and expense of a separate trial. Miller claims denial of severance deprived him a right to a fair trial. The record reflects that Miller preserved this issue for appeal.

Generally, persons charged in a conspiracy should be tried together, especially when proof against all defendants is based upon the same evidence or acts. *United States v. Smith,* 578 F.2d 1227, 1236 (8th Cir.1978). Severance should be granted only upon a showing of "real prejudice" to an individual defendant's right to a fundamentally fair trial; this requires more than merely showing that a separate trial will enhance the chance of acquittal. *Id.; United States v. Reed,* 658 F.2d 624, 629 (8th Cir.1981), *cert. denied,* 455 U.S. 1002, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982). Moreover, a motion for severance under *Fed.R.Crim.P.* 14 is addressed to the sound discretion of the trial court. *Id.* Thus, "[a] denial of severance is not ground for reversal unless clear prejudice and an abuse of discretion if shown." *Id., citing, United States v. Jackson,* 549 F.2d 517, 523 (8th Cir.), *cert. denied,* 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977); *see also Reed,* 658 F.2d at 629. Finally, in showing an abuse of discretion and real prejudice, a defendant shoulders a heavy burden. *United States v. Rochon,* 575 F.2d 191, 197 (8th Cir.1978).

In *United States v. Starr,* 584 F.2d 235, 238–39 (8th Cir.) *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1019, 59 L.Ed.2d 73 (1979), the court recognized that such "real prejudice" mandating severance was established where the defendant could show that the "co-defendant is likely to testify at a separate trial and the testimony would exculpate him." *See also United States v. Wofford,* 562 F.2d 582, 586 (8th Cir.1977). Hence, despite defendant's suggestion, *Starr* does not mandate severance everytime a co-defendant would testify on the defendant's behalf at a separate trial; nor does it require severance when the co-defendant's testimony would merely increase the chances of acquittal or tend to rebut some aspect of the government's case. Instead, it requires severance only when the co-defendant's proffered testimony "would exculpate" the defendant requesting severance. In *Starr,* for example, the co-defendant testified before a grand jury that he had never purchased any narcotics from defendant Starr. As the court found, this testimony, which was likely to be repeated at a separate trial for Starr, would have "exonerated" or "absolved" Starr from the charges alleged in the indictment. *Id.* at 239–40.

In this case the co-defendants did not indicate they could give testimony that would "exculpate", "exonerate", or "absolve" Miller from the charged offenses. At most, the prospective testimony would have served merely to rebut Yancy's testimony that Miller was involved in the marijuana loading operation at C.D.Y. on February 6 and 7. Moreover, here, unlike in *Starr,* the trial court properly pointed to "other substantial evidence" implicating the defendant in the marijuana distribution conspiracy; this other evidence would not have been undercut by the co-defendants expected testimony. For instance: (1) Yancy testified, and independent evidence confirmed, that Miller was in Florida in late January, 1980 with co-defendants Reed, Riebli, Sheary and Blair; Yancy was in Florida to obtain marijuana; (2) Miller and Blair stayed at the Sheraton Westport Inn at the same time Meoli and Cabrera (Olivastro members) were staying there; (3) Officer Stolte testified that he saw Miller, driving a white over blue Mercury Cougar, help Meoli in starting the U-Haul truck rented by Meoli; (4) officers saw the same Cougar parked between the Oklahoma and Colorado Ryders at the San Antonio Inn; these Ryders were later loaded with marijuana at C.D.Y.; (5) on February 7, 1980, Miller, driving the Cougar, arrived at C.D.Y., entered the rear area, and then backed out as soon as he saw Detective Jones; shortly thereafter Meoli arrived at C.D.Y.; (6) the search of the Cougar revealed an airline ticket in Miller's name for January 29, 1980; and (7) Miller's finger-

prints were on a beer bottle found inside C.D.Y. The evidence, considered cumulatively, implicated Miller in the conspiracy and rendered highly implausible Miller's defense that he was in St. Louis, at Blair's [10] request, for wholly non-criminal reasons. We therefore conclude that the trial court did not abuse its discretion in denying Miller's severance motion; Miller's right to a fundamentally fair trial was not deprived because of his joinder with his co-conspirators/co-defendants.

Affirmed.

**10.** Blair died, apparently by suicide, prior to the defendants' trial.