Filed 1/12/24  P. v. Popke CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DOUGLAS LOUIS POPKE,<br><br>Defendant and Appellant. | F084966<br><br>(Mariposa Super. Ct. No. 17207)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT]** |

THE COURT:

It is ordered that the opinion filed herein on December 28, 2023, be modified as follows:

1.  On page 16, in the last paragraph, at the end of the sentence that states "Therefore, contrary to appellant's claim, the jury was able to convict appellant of attempted murder without necessarily making the additional finding that the victim was a peace officer," add as footnote 5 the following footnote, which will require renumbering of all subsequent footnotes:

> [5]  In a footnote in his reply brief, appellant argues that the verdict form for count 1 only gave the jury the all-or-nothing choice of convicting appellant of willful and premeditated attempted murder of a peace officer, or of finding him not guilty entirely.  In other words, according to appellant, the verdict form did not allow the jury to convict appellant of only attempted murder.
>
> We reject this argument for two reasons.  First, "we do not consider arguments raised for the first time in a reply brief."  (*People v. Mickel* (2016) 2 Cal.5th 181, 197.)

Second, nothing in the record demonstrates the verdict forms prevented the jury from returning a different verdict. The record only includes the verdict forms completed by the jury. It does not include any unused verdict forms. The trial court instructed the jury with CALCRIM No. 641, which stated it would receive separate verdict forms for guilty on each potential offense or lesser included offense as to count 1, and for not guilty. The court further instructed the jury to "sign only one verdict form per count," and to "[r]eturn the unused verdict forms to [the court], unsigned." Thus, it appears the jury was given multiple different verdict forms encompassing the different possible verdicts, but that it only signed the verdict form stating it found appellant guilty of willful and premediated attempted murder of a peace officer.

Despite this, appellant made no effort to augment the record with the unused verdict forms. (See Cal. Rules of Court, rule 8.340.) Appellate counsel has a "duty to insure that there is an adequate record before the appellate court from which [the appellant's] contentions may be resolved on their merits. Where the appropriate record is missing or incomplete, counsel must see that the defect is remedied, by requesting augmentation or correction of the appellate record." (*People v. Barton* (1978) 21 Cal.3d 513, 519–520.) Instead of seeking to provide a complete appellate record by moving to augment the record with the unused verdict forms, appellant invites us to assume that they do not exist. We decline to do so.

There is no change in the judgment.

Appellant's petition for rehearing filed on January 5, 2024, is denied.


Levy, Acting P. J.

WE CONCUR:


Poochigian, J.


De Santos, J.

2.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DOUGLAS LOUIS POPKE,<br><br>Defendant and Appellant. | F084966<br><br>(Super. Ct. No. 17207)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Mariposa County.  Michael A. Fagalde, Judge.

Charles M. Bonneau, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Brook A. Bennigson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

A jury convicted Douglas Louis Popke (appellant) of attempted willful, deliberate, and premeditated murder of a peace officer (§§ 664, subds. (e), (f), 187, subd. (a); count 1)[1] with a discharge of a firearm enhancement (§ 12022.53, subd. (c)), and assault with an assault weapon on a peace officer (§ 245, subd. (d)(3); count 2) with a use of a firearm enhancement (§ 12022.5, subd. (a)). The trial court sentenced appellant to 15 years to life plus 20 years in state prison.

On appeal, appellant raises claims of insufficiency of the evidence, failure to instruct on lesser included offenses, failure to exclude inadmissible character evidence, and prosecutorial misconduct. We conclude no error occurred, and that any presumed error was harmless. However, we agree with the parties that appellant's sentence on count 2 and the associated use of a firearm enhancement must be stayed pursuant to section 654, subdivision (a). We affirm.

## BACKGROUND

### I. A Sheriff's Deputy Goes to Appellant's Residence to Attempt to Serve him with Court Documents. Appellant Responds by Shooting at the Deputy with an Assault Rifle.

On the evening of August 28, 2020, Mariposa County Sheriff's Deputy Jose Garcia was tasked with serving appellant with court documents.[2] Service of court documents was part of his regular duties as a deputy sheriff. At the start of his shift, Garcia's sergeant provided him with the court documents, along with a "trip ticket," which included appellant's identifying information. The trip ticket was marked "rush," meaning it needed to be served as soon as possible. The trip ticket also stated appellant worked Monday through Friday, and that service at his residence should be attempted after 5:00 p.m.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The nature of the court documents was not revealed to the jury.

Garcia drove to appellant's residence in a fully marked patrol vehicle with a sheriff's logo on the side and a light bar on top. He wore a fully marked uniform, including a badge and a hat with a sheriff's logo. He reached appellant's property at approximately 7:30 p.m. Garcia testified there was still plenty of light outside when he arrived.

Appellant lived on a five-acre parcel in rural Mariposa County. The residence was in the center of the parcel and not visible from the street. An approximately 400-yard dirt driveway led from the street to the residence. There was a rustic metal gate about 150 yards up the driveway, connected to wire fencing that enclosed a large portion of the parcel. Signs posted near the gate read: "No Trespassing," "Keep Out," and "Nothing In Here is Worth Dying For."

Garcia drove his patrol vehicle up the driveway and stopped at the gate. The gate was closed and appeared to be locked with a chain and padlock. Upon closer inspection, Garcia observed the gate was "dummy-locked," meaning it was secured with a chain and padlock, but not actually locked. Garcia took off the lock, unwrapped the chain, and opened the gate. He then got back into his patrol car and drove through the gate. He did not close the gate behind him. He continued another 200 yards up the driveway and parked near appellant's residence.

Before Garcia exited his patrol vehicle, he activated his body-worn camera, which captured his interactions with appellant. A copy of the video was admitted into evidence and played for the jury.

Garcia testified that as he approached the residence, he observed the area around the front door was blocked with "[a] cluttered mess." For this reason, he did not believe the front door was the commonly used entrance and exit to the house. He walked down the dirt driveway, which went along the left side of the house to the back. The driveway was not obstructed by a gate or any other obstacle. He observed the back door to the residence was not blocked with items, and concluded it was likely the commonly used

3.

entrance. He explained it was common in Mariposa County for people to use the back door as the main door to the house.

Garcia knocked on the back door and announced, "Hello, Sheriff's Office." After a few moments, appellant answered the door and stepped outside, saying, "There he is." Garcia stated, "Sheriff's Office, how you doing sir? Are you uh Douglas …." Appellant interrupted Garcia, stating, "No. What are you doing partner?" Garcia tried to explain that he was there to serve court documents, but appellant interrupted him again, stating, "You came through my god damn gate, it was locked." Garcia responded, "[H]ang on. It was not locked," but appellant went back inside of his house, stating, "No, no, no, no, you came through." Garcia remained outside, and advised appellant, "I'm going to leave paperwork here for you."

Garcia testified he was planning to leave but became suspicious when he heard appellant moving around inside of the residence "with a purpose … with an intent." He also heard a woman's voice say, "Where are you going? What are you doing? What's going on?" This caused Garcia to become concerned appellant had gone into the house to retrieve a firearm. Garcia drew his service pistol and held it pointing down at "low ready" and waited at the back corner of the house.

Soon after, appellant exited through the front door of his residence holding an AR-style assault rifle. He stepped around the front corner of the house and stood between Garcia and his patrol car, approximately 30-40 feet from Garcia. Appellant held the assault rifle with his right hand, with his hand on the pistol grip and the barrel pointed down. He pointed at Garcia's patrol car with his left hand and yelled something that Garcia could not make out. Garcia described appellant's demeanor as hostile and angry.

Garcia pointed his service pistol at appellant and yelled, "Hang on, stop. Put the gun down." Appellant dropped his left hand down to the rifle and began to raise the barrel toward Garcia. Garcia believed appellant was going to shoot him, so he fired three

4.

shots at appellant. One of the shots struck the charging handle of appellant's assault rifle, then ricocheted into his right shoulder.

While Garcia was firing the three shots, appellant began shooting at Garcia. Garcia immediately retreated behind the back corner of the house, leaning out twice to return fire. Appellant continued to shoot at Garcia as he hid behind the corner of the house. Two of the rounds went through the house and exited in front of Garcia's face.

Recognizing appellant was armed with a superior weapon capable of shooting through cover, Garcia elected to retreat. He could also see that appellant was advancing toward him. Garcia turned and ran past the back door and across the back porch. While Garcia was fleeing, appellant fired at least five additional shots with the assault rifle. As he stepped off of the back porch, Garcia lost his balance and fell, but was able to get to his feet and continue to run.

Garcia ran across appellant's property and climbed over multiple fences, two of which were electrified. He eventually stopped at the residence of one of appellant's neighbors and used the neighbor's landline to call for backup. He checked over his body and confirmed he had not been shot.

After additional officers arrived on scene, appellant's adult son called 911 and stated appellant had locked himself inside of a shipping container on appellant's property. A law enforcement "special response team" identified the shipping container and called for appellant to come out over a loudspeaker, which he eventually did. As appellant was taken into custody, he asked "how that fat cop that he shot was doing."

## II. Crime Scene Evidence.

Inside of the shipping container, officers recovered the rifle appellant used to shoot at Garcia—a .300 Blackout AR-style rifle. A firearms expert examined the rifle and opined it constitutes an assault weapon under California law. Officers located

several other firearms inside the shipping container, including an additional AR-style rifle.

At the scene of the shooting, there were 13 expended .300 blackout cartridge casings and six expended nine-millimeter cartridge casings. A firearms expert examined the casings and opined that the .300 blackout casings were fired by appellant's assault rifle, and the nine-millimeter casings were fired by Garcia's service pistol. The pattern of the .300 blackout casings on the ground suggested appellant advanced toward the back corner of the house as he was firing the assault rifle.

Law enforcement personnel observed several bullet holes in the back corner of appellant's residence. They also observed a bullet entrance hole and exit hole in a plastic garbage can on appellant's back porch. The garbage can was located along the path Garcia took as he fled across the back porch and away from appellant. The location of the holes was consistent with appellant having shot at Garcia as he ran away. A firearms expert used appellant's assault rifle to fire a test shot through the garbage can. The resulting bullet hole matched the initial bullet holes discovered by law enforcement personnel.

## III. Testimony of Other Witnesses.

The People called an expert in police practices, use of force, and digital media evidence. Based on his review of the video from Garcia's body-worn camera, the expert opined that Garcia was justified in using deadly force when appellant raised the barrel of his assault rifle toward him, and under the circumstances, Garcia had no reasonable alternative to using deadly force.

Appellant's neighbor testified he was in his home when he saw a police officer run across his front yard. He went outside and saw appellant near the fence line of his property holding an AR-style assault rifle. When he asked appellant what was going on, appellant told him, "A cop shot me," and "I'm looking for that fat cop."

6.

Another of appellant's neighbors testified he has had conversations with appellant about law enforcement coming onto his property. During one of those conversations, appellant stated that if law enforcement came through his gate and to his house, "there might be a confrontation." Prior to trial, in a statement to law enforcement, the neighbor stated appellant "had planned this exact incident," and that appellant told him he "would use firearms against law enforcement if they ever came to his property."

## IV.	Appellant's Statements and Testimony.

Appellant was transported to the hospital for treatment for his gunshot wound. When a member of the emergency room staff told appellant that if he had been shot in the center of the chest, "there would not have been much left of him," appellant responded, referring to Garcia, "Wouldn't be much left of him." A minute later, appellant stated, referring to law enforcement: "They are pussies. Use nine-millimeter. He's just lucky I didn't pull a fucking .45 on him."

Appellant was interviewed by law enforcement the following day. He admitted he "screwed up bad," and that the judge can do "[w]hatever [he] wants to do to me." However, he continued to insist that Garcia should not have gone through his gate, which he repeatedly claimed was locked. He stated that Garcia did not give him the opportunity to drop his rifle, and after Garcia shot him, he went "ballistic." He felt he had to "take him out," and tried to hit Garcia by shooting through the corner of his house because he knew his "bullets go through wood." He moved forward toward the corner of the house while he was shooting because he was "trying to get another angle on him." He saw Garcia take off "like a rabbit" and fall after he ran across the back porch. He denied shooting at Garcia as he ran away.

At trial, appellant testified he was 69 years old when the shooting occurred. On the evening of the shooting, he was at home with his wife and adult son. He thought he

7.

had locked the driveway gate earlier that day. He testified he usually kept the gate locked at night for safety reasons, but sometimes he only left it dummy locked.

Appellant testified that sometime after dinner, while he was in his office, he heard his wife say that someone was at the back door. He opened the door and saw a person wearing plain clothes with a gun on his hip. He did not see a uniform or a badge. He was concerned because the person came through the gate, which he believed was locked. He confronted the person about coming through the gate, then went into his house and armed himself with the assault rifle. The rifle was loaded with "fragmentation rounds," which appellant acknowledged were designed to "inflict maximum damage" on living things.

As appellant exited his front door, he saw a patrol car parked in the driveway, and realized the person at his house was a deputy sheriff. He testified the deputy pointed his pistol at him and ordered him to drop his rifle, but that the deputy started shooting before he was able to comply. He claimed he returned fire because he thought the deputy was going to kill him. He continued to shoot as he moved toward the deputy, but denied shooting at him as he fled across the back porch.

After the shooting, appellant went to his shipping container and obtained a different rifle because one of the deputy's bullets struck and damaged his original rifle. He went to his driveway gate, which was open, and closed and locked it, then went toward his neighbor's property to look for the deputy. After speaking with his neighbor, he went back to his shipping container to "bleed out." He denied that he intended to murder the deputy, or that he had planned out his interaction with law enforcement that day.

**DISCUSSION**

**I.    The Jury's Finding that Garcia was Lawfully Performing his Duties as a Sheriff's Deputy was Supported by Substantial Evidence.**

Attempted murder of a peace officer and assault with an assault weapon on a peace officer both include the element that the victim was a peace officer engaged in the lawful performance of his or her duties.  (§§ 664, subd. (e), 245, subd. (d)(3).)  Appellant claims the record contains insufficient evidence of this element because Garcia violated his Fourth Amendment rights by coming onto his property through the dummy-locked gate and approaching the back door of his house.  Respondent contends that appellant conceded that Garcia's conduct was lawful by failing to object to the trial court's instruction that a peace officer "may legally enter private property" to effectuate service.  We reject respondent's contention that the element was conceded, but conclude the record conclusively establishes Garcia's conduct was reasonable under the Fourth Amendment, and therefore appellant's convictions were supported by substantial evidence.

**A.    Background.**

In their motions in limine, the People requested the trial court instruct the jury that a deputy sheriff has "the legal right and duty to enter private property to serve valid court process at any time of the day or night," and that it is "not a defense … that the deputy entered a closed gate onto private property."  Appellant filed a response arguing the court should instead instruct the jury that a deputy may only attempt to effectuate service "at a reasonable time and in a reasonable manner."

During oral argument, defense counsel agreed that "a deputy sheriff has a right and a duty to serve process on private property," and stated he was not arguing Garcia had committed criminal trespass.  Instead, defense counsel clarified he was requesting the court instruct the jury that "it's up to them to determine if the sheriff was exercising reasonable speed, diligence, time, and in a reasonable manner."

9.

The court concluded that it would consider both proposed instructions, draft its own version of the instruction, and discuss it with the parties. The court noted, however, that the instruction would include language that " '[t]he deputy has a right and duty to serve process, which includes the right to enter on to private property through a closed gate,' or something like that." When asked if that would "work" for him, defense counsel responded, "[s]ubmitted."[3]

After the close of evidence, the trial court held a jury instructions conference with the parties off the record. Once back on the record, defense counsel stated he had no objection to the trial court's proposed instructions.

As pertinent here, the trial court gave the following jury instructions: "A Mariposa County Deputy Sheriff is a peace officer;" "The duties of a Deputy Sheriff include service of civil process;" and, "A peace officer may legally enter private property to serve, or attempt to serve, civil papers or orders issued by any court."

## B. Standard of review.

Attempted murder of a peace officer includes the element that the victim was a peace officer engaged in the lawful performance of his or her duties. (§ 664, subd. (e); *In re Manuel G.* (1997) 16 Cal.4th 805, 815; CALCRIM No. 602.) Assault with an assault weapon on a peace officer includes the same element. (§ 245, subd. (d)(3); CALCRIM No. 860.) "California cases hold that although the court, not the jury, usually decides whether police action was supported by legal cause, disputed facts bearing on the issue of legal cause must be submitted to the jury considering an engaged-in-duty element, since the lawfulness of the victim's conduct forms part of the corpus delicti of the offense." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1217.)

---

[3] After motions in limine were argued and the jury was sworn, the trial court declared a mistrial because appellant was quarantined due to COVID exposure, and a witness tested positive for COVID. The parties agreed that the trial court's previous rulings would carry over to the next trial.

10.

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) We "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "We need not be convinced of the defendant's guilt beyond a reasonable doubt; we merely ask whether ' "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.)

### C. Appellant did not concede the element that Garcia was lawfully performing his duties as a peace officer.

We begin by addressing respondent's argument that appellant conceded that Garcia was lawfully performing his duties by failing to object to the instruction that a peace officer "may legally enter private property" to effectuate service. Respondent contends that, due to this instruction, "there were no disputed issues of fact for the jury to decide" on the issue of lawful performance.

We reject the premise of respondent's argument that the jury instruction removed the lawful performance element from the jury's consideration. Lawful performance is an element the People were required to prove, and appellant did not stipulate to the truth of that element. The jury was instructed as to each offense that to convict appellant it must find beyond a reasonable doubt that Garcia was lawfully performing his duties as a peace officer. The instruction that a peace officer "may legally enter private property" to effectuate service merely provided the jury with guidance on the law—namely, what a peace officer may lawfully do while serving or attempting to serve civil process. It did not resolve all factual disputes and establish the lawful performance element as a matter

11.

of law.  The jury was still required to determine whether Garcia's conduct was otherwise lawful.  Ultimately, the element of lawful performance was decided by the jury, and the question of whether the jury's finding was supported by sufficient evidence is properly subject to our review.  (See *Jackson v. Virginia* (1979) 443 U.S. 307, 316–319 [due process guarantees all criminal conviction be supported by sufficient evidence].)

**D.     Substantial evidence supported the jury's finding that Garcia's conduct was lawful.**

Appellant's sufficiency of the evidence claim is based solely on his assertion that Garcia's entry onto his property violated the Fourth Amendment.  Appellant does not suggest that Garcia violated any California statutory law.  Indeed, California law authorizes sheriff's deputies to enter private property to effectuate service.  The Penal Code expressly exempts sheriff's deputies involved in service of process from criminal statutes prohibiting trespass on private property.  (See, e.g., § 602, subd. (n) [excluding any sheriff who drives a vehicle upon the real property of another to effectuate service]; § 602.8, subds. (a), (c)(3) [excluding any sheriff who enters lands "enclosed by fence" or "where signs forbidding trespass are displayed" to effectuate service]; see also Gov. Code, § 26608 ["The sheriff shall serve all process and notices in the manner prescribed by law."].)

Under the Fourth Amendment, Garcia's entry onto appellant's property was unlawful if it was a "governmental intrusion upon … an area in which he has a reasonable expectation of privacy."  (*People v. Mayberry* (1982) 31 Cal.3d 335, 341.)  Appellant asserts that Garcia violated his Fourth Amendment rights by opening the gate onto his property and approaching his house from the back door.

We disagree.  "Our Supreme Court has made clear that a police officer who makes an uninvited entry onto private property does not per se violate the occupant's Fourth Amendment right of privacy.  The criterion to be applied is whether entry is made into an area where the public has been implicitly invited, such as the area furnishing normal

12.

access to the house.  A reasonable expectation of privacy does not exist in such areas."
(*In re Gregory S*. (1980) 112 Cal.App.3d 764, 775, citing *Lorenzana v. Superior Court*
(1973) 9 Cal.3d 626; see also *United States v. Reed* (8th Cir. 1984) 733 F.2d 492, 501
["no Fourth Amendment search occurs when police officers who enter private property
restrict their movements to those areas generally made accessible to visitors—such as
driveways, walkways, or similar passageways"].)

Here, Garcia used normal access routes to attempt to contact and serve appellant.
He opened an unlocked gate, parked his patrol car in the driveway, walked along the
unobstructed driveway to what he believed was the commonly used door to the house,
and knocked.  His actions were consistent with that of a private citizen attempting to
contact the occupants of appellant's residence.  He "exercised no more than ' "the same
license to intrude as a reasonably respectful citizen" '—any door-to-door salesman would
reasonably have taken the same approach to the house."  (*People v. Lujano* (2014) 229
Cal.App.4th 175, 184.)

Appellant argues that Garcia approaching and knocking on the back door of the
house rather than the front door was unreasonably intrusive.  But on the record before this
court, Garcia's decision to try the back door was reasonable.  Garcia testified that the area
around the front door was blocked with clutter.  Garcia's body-worn camera footage, and
the photographs admitted into evidence, confirm this observation.  Conversely, the back
door was easily accessible from the driveway, which provided a clear, unobstructed path
around the side of the house to the back.  As Garcia explained, in his experience it was
common for people in Mariposa County to utilize the back door as the common entrance.
Thus, it was reasonable for Garcia to conclude that the back door, rather than the front
door, was the commonly used entrance to the house.  By proceeding to and knocking on
the back door, Garcia did not intrude upon an area where appellant had a reasonable
expectation of privacy.

We are also unpersuaded that Garcia's opening of an unlocked gate to attempt to contact appellant was an unreasonable intrusion under the Fourth Amendment.[4]  The unlocked gate was along the driveway, an area providing normal access to the house and generally made accessible to visitors.  (*In re Gregory S.*, *supra*, 112 Cal.App.3d. at p. 775; *United States v. Reed*, *supra*, 733 F.2d at p. 501.)  Under these circumstances, Garcia's entry through the unlocked gate did not implicate a reasonable expectation of privacy.  (See *United States v. Robbins* (8th Cir. 2012) 682 F.3d 1111, 1115 ["We have held that police entry through an unlocked gate on a driveway to approach the front door of a residence for a 'knock-and-talk' is a reasonable, limited intrusion for legitimate law enforcement objectives."]; *People v. Lujano*, *supra*, 229 Cal.App.4th at p. 184 [officers entering a driveway and passing through two unlocked gates to attempt to initiate consensual contact with the occupants was not an unreasonable intrusion under the Fourth Amendment]; see also *Vickery v. Superior Court* (1970) 10 Cal.App.3d 110, 119 ["If in the course of his proper duties as a police officer, that officer is required to make an investigation at a private home, it would seem an unreasonable deterrent to the public's interest in that investigation, that it can be precluded by the mere existence of an unlocked gate."].)

Appellant's reliance on *People v. Winters* (1983) 149 Cal.App.3d 705 (*Winters*) is unavailing.  There, officers went to the appellant's residence to attempt to contact his son about an unrelated criminal matter.  (*Id.* at p. 707.)  After approaching the front door and discovering no one was home, the officers went through an unlocked gate into the back yard "to investigate," and discovered marijuana plants.  (*Id.* at pp. 707–708.)  The court held the entry into the backyard violated the Fourth Amendment, reasoning that once the

---

[4]    While appellant characterizes the gate as "apparently locked," it is clear from the record that the gate was in fact not locked.  Garcia testified the gate was unlocked, and appellant testified that after the shooting, he closed the gate and locked it, foreclosing any suggestion that Garcia damaged the lock to open the gate.

officers determined no one was inside, "their official business at Winters' home ended," and they were not otherwise justified in entering the backyard. (*Id.* at p. 708.) Here, unlike the officers in *Winters*, Garcia never departed from normal access routes to the home that are generally made accessible to visitors. Rather, Garcia entered appellant's property through an unlocked gate solely to attempt to contact appellant by knocking on his door. He did not do anything other than what one would reasonably expect an ordinary visitor to a house would do. (See *People v. Lujano*, *supra*, 229 Cal.App.4th at p. 184.)

In his reply brief, appellant raises the related claim that the jury should have been instructed that a dummy-locked gate is the same thing as a gate that is actually locked "for Fourth Amendment purposes." Appellant did not request this instruction below, and therefore, it is forfeited. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 877 ["failure to request clarifying language forfeits the issue on appeal"]; *People v. Buenrostro* (2018) 6 Cal.5th 367, 428; *People v. Hardy* (2018) 5 Cal.5th 56, 91.) In any event, appellant provides no authority to support this claim, and it is contradicted by the authorities discussed above.

The evidence at trial was overwhelming that Garcia's conduct was lawful, and that he did not violate appellant's Fourth Amendment rights. Accordingly, the jury's finding that Garcia was engaged in the lawful performance of his duties as to counts 1 and 2 was supported by substantial evidence, and this claim lacks merit.

## II.    The Trial Court did not Fail to Properly Instruct the Jury on Lesser Included Offenses.

Appellant claims the trial court failed to instruct the jury on lesser included offenses on both counts. As to count 1, premeditated attempted murder of a peace officer, appellant contends the jury should have been instructed on ordinary attempted murder (§§ 664/187, subd. (a)). As to count 2, assault with an assault weapon on a peace officer, appellant contends the jury should have been instructed on ordinary assault with a

15.

firearm (§ 245, subd. (a)(2)). As we explain, the jury was properly instructed on these lesser offenses, and thus no instructional error occurred.

### A. Standard of review.

A trial court has a sua sponte duty to instruct " 'on all theories of a lesser included offense which find substantial support in the evidence.' " (*People v. Smith* (2013) 57 Cal.4th 232, 240.)

### B. The trial court properly instructed the jury on attempted murder and the additional allegation that the victim was a peace officer lawfully performing his duties.

Initially, we note that appellant incorrectly characterizes attempted murder as a lesser included offense to premeditated attempted murder of a peace officer. Rather, attempted murder (§§ 664/187, subd. (a)) is a substantive offense, and the allegation that the victim was a peace officer (§ 664, subd. (e)) is a sentence enhancement requiring a separate finding by the jury. (See *People v. Smith* (2005) 37 Cal.4th 733, 740; *People v. Favor* (2012) 54 Cal.4th 868, 876–877; Bench Notes to CALCRIM No. 602 [noting that attempted murder of a peace officer is a sentencing enhancement].)

The trial court correctly instructed the jury in accordance with this structure. First, it gave CALCRIM No. 600 (Attempted Murder), which set forth the elements of attempted murder. Then, it gave CALCRIM No. 602 (Attempted Murder: Peace Officer, Firefighter, Custodial Officer, or Custody Assistant), which specified that if the jury finds appellant guilty of attempted murder, it must then decide whether the People have proved the additional allegation that appellant attempted to murder a peace officer in the lawful performance of his duties. Therefore, contrary to appellant's claim, the jury was able to convict appellant of attempted murder without necessarily making the additional finding that the victim was a peace officer.

### C. The trial court properly instructed the jury with the lesser included offense as to count 2 of assault with a firearm.

Appellant contends that as to count 2, the jury should have been instructed with the lesser included offense of assault with a firearm (§ 245, subd. (a)(2)), because it provided a "readily available alternative" if the jury had a reasonable doubt that Garcia was lawfully performing his duties. Respondent points out, however, that the jury was instructed with this lesser included offense. Appellant concedes this claim in his reply brief. We agree with the parties that the jury was properly instructed, and no error occurred.[5]

### D. Appellant's remaining instructional error claims regarding excessive force and manner of service lack merit.

Appellant also briefly raises two claims of instructional error pertaining to the lawful performance element.[6] First, he contends the jury should have been instructed that service of civil process must be performed with "reasonable speed and reasonable diligence" and "at a reasonable time and in a reasonable manner." Second, he argues the jury should have been instructed on "excessive force," because the jury could have determined Garcia used unreasonable force and therefore was not lawfully performing his

---

[5] Throughout his briefs appellant interchangeably refers to assault with a firearm (§ 245, subd. (a)(2)) as assault with an assault weapon (§ 245, subd. (a)(3)). For purposes of our analysis, it does not matter whether he intended to suggest the trial court should have instructed on either offense. Appellant concedes the claim, and there was no dispute at trial or on appeal that appellant's rifle constituted an assault weapon under California law.

[6] Respondent criticizes appellant's briefing of these claims for providing "no separate heading and effectively no analysis or discussion." Respondent contends this violates California Rules of Court, rule 8.204(a)(1)(B), which requires that all briefs "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority." Because we conclude appellant's instructional error claims are forfeited and lack merit, we need not consider this contention.

17.

duties.[7]  We conclude these claims are forfeited, and that any presumed error was harmless.

### 1.      The instructional error claims are forfeited.

Appellant did not request an instruction on excessive force at trial.  While defense counsel did request an instruction regarding the manner of service of civil process at the start of trial, he acquiesced to the court's suggestion that it would consider the arguments of counsel and craft its own instruction on the issue, to be reviewed by the parties after the close of evidence.  Subsequently, defense counsel did not lodge an objection to the trial court's decision not to give his proposed manner of service instruction when jury instructions were finalized at the jury instruction conference.

Appellant contends he may raise these claims for the first time on appeal because the alleged instructional errors affected his substantial rights.  (§ 1259; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 103, fn. 34.)  However, an appellant may not argue that a correct instruction was too general or incomplete, and thus needed clarification, without requesting clarification at trial.  (*People v. Buenrostro*, *supra*, 6 Cal.5th at p. 428; *People v. Covarrubias*, *supra*, 1 Cal.5th at p. 877; *People v. Hardy*, *supra*, 5 Cal.5th at p. 91.)  Appellant's proposed instructions merely served to clarify the lawful performance element, which was properly given.  Accordingly, the claims are forfeited.

### 2.      Any presumed error was harmless.

Even assuming appellant properly preserved these instructional error claims, we need not address them on their merits because any presumed error was harmless.

Depending upon the basis of the claimed error, instructional error is reviewed under either *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), or *People v.*

---

[7]      Presumably, appellant is referring to portions of CALCRIM No. 2670 (Lawful Performance:  Peace Officer) pertaining to use of force by a peace officer.

18.

*Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). Under the more stringent *Chapman* standard, which applies to errors of constitutional dimension, reversal is required unless the reviewing court can conclude beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman*, *supra*, 386 U.S. at p. 24.) Under the alternative *Watson* standard, which applies to errors of state law, reversal is not required unless it is reasonably probable the defendant would have obtained a more favorable result had the error not occurred. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

We need not decide whether the *Chapman* or *Watson* standard for prejudicial error applies here because the error was harmless under either standard.

With respect to the manner of service instruction, the evidence conclusively established that Garcia's actions in attempting to serve appellant were reasonable. He went to appellant's residence at approximately 7:30 p.m., while it was still light outside. As we explained above, Garcia only utilized normal access routes to the home, and knocked on what he reasonably believed was the commonly used door to the residence. He spoke to appellant in a polite and respectful tone and did nothing that could be construed as intrusive or alarming. On this record, there is no basis to conclude the proposed instruction on manner of service contributed to the outcome of the trial.

With respect to the excessive force instruction, the evidence was overwhelming that Garcia did not use excessive or unreasonable force. A peace officer may lawfully use deadly force if he or she "[r]easonably believed, based on the totality of the circumstances, that the force was necessary to defend against an imminent threat of death or serious bodily injury to the officer or another person." (CALCRIM No. 2670; see § 835a, subd. (c)(1)(A).) Here, the evidence was undisputed that appellant exited the front door of his residence and angrily confronted Garcia while holding an assault rifle. Garcia did not discharge his service pistol until appellant ignored his command to drop the rifle, and instead began raising the barrel of the rifle toward him. He only continued to shoot at appellant in response to appellant shooting at him with the assault rifle.

19.

Appellant's testimony that Garcia did not give him the opportunity to drop the rifle before he started firing his service pistol is clearly contradicted by the evidence, including Garcia's body-worn camera footage. Moreover, the jury was instructed on perfect and imperfect self-defense, and they rejected both. Therefore, there is no reason to believe the absence of an excessive force instruction impacted the trial.

Considering the overwhelming strength of the evidence, the guilty verdict rendered in this trial was surely unattributable to the purported errors. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.) Accordingly, we conclude beyond a reasonable doubt that the trial court's failure to instruct on the manner of service or excessive force did not contribute to the verdict, and these claims lack merit.

## III. Appellant's Claim that the Trial Court Should Have Excluded Evidence of Other Firearms is forfeited. Any Presumed Error was Harmless.

Appellant claims the trial court erred in admitting evidence that he possessed firearms other than the rifle he used in the shooting. He argues this was inadmissible character evidence pursuant to Evidence Code section 1101, subdivision (a), because the jurors may have believed the firearms evidence showed he had a propensity for violence. We agree with respondent that appellant forfeited this claim by failing to object below. Regardless, any presumed error in admitting the evidence was harmless.

### A. Background.

Before trial, appellant moved in limine to exclude evidence of firearms and ammunition discovered by law enforcement in his residence and shipping container. In his written motion, appellant argued this evidence was unduly prejudicial and irrelevant to the charged crimes, and therefore should be excluded under Evidence Code section 352. During oral argument, defense counsel stated his client was a long time "gun enthusiast," and possessed approximately 30 to 50 firearms, which were photographed and documented by law enforcement. The People opposed the motion, arguing that the firearms evidence showed appellant was knowledgeable about weapons, and therefore

20.

"knew what he was doing" when he confronted Garcia with an assault rifle. The trial court denied the motion to exclude the firearms evidence without prejudice, noting that appellant may object to specific items of evidence as they come up during trial.

At trial, evidence that appellant possessed firearms that were not used in the charged offenses was admitted without objection from the defense. The evidence appellant claims should have been excluded at trial includes: his neighbor's statement to law enforcement that he said he would use firearms against law enforcement if they came onto his property; a photograph of the interior of appellant's storage shed, which depicted the rifle used in the shooting, and other unrelated handguns and rifles; testimony of an officer who said he saw "a lot of firearms" inside of appellant's residence; evidence that appellant was carrying a pistol at the time of the shooting; and testimony by appellant and others that he was a firearms enthusiast and kept numerous firearms for protection against wildlife and intruders.

## B. The claims are forfeited.

As a threshold matter, we agree with respondent that appellant forfeited his claim for failure to object below. "[C]hallenges to the admission of evidence must be preserved for appellate review with a timely and specific objection at trial." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328; see Evid. Code, § 353, subd. (a).) While appellant made a motion in limine to exclude the evidence of other firearms, that motion was denied without prejudice to raise objections to specific items of evidence during trial. (See *People v. Mills* (2010) 48 Cal.4th 158, 170 ["As a general matter, when a trial court denies a motion without prejudice the matter is forfeited if not renewed."].) Defense counsel made no such further objections. Accordingly, the claim is forfeited.

## C. Any presumed error was harmless.

Even assuming appellant had properly preserved the evidentiary claim on appeal, any presumed error was harmless.

21.

The erroneous admission of character evidence or prior misconduct is subject to the *Watson* harmless error standard. (*Watson*, *supra*, 46 Cal.2d 818, 836; *People v. Scheer* (1998) 68 Cal.App.4th 1009, 1018–1019; see also *People v. Marks* (2003) 31 Cal.4th 197, 227 ["the application of ordinary rules of evidence … does not implicate the federal Constitution, and thus we review allegations of error under the 'reasonable probability' standard of *Watson*"].) In assessing prejudice under *Watson*, "an appellate court may consider 'whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Rogers* (2006) 39 Cal.4th 826, 870.)

Here, the evidence of appellant's guilt was overwhelming. Without provocation, appellant angrily confronted Garcia with an assault rifle. The rifle was loaded with "fragmentation rounds," which appellant testified were designed to inflict maximum damage on living targets. He shot at Garcia a total of 13 times. He advanced toward Garcia while he was shooting, intentionally shooting through his house to try to hit Garcia as he took cover behind it. When appellant reached the back corner of the house, he elected to continue firing across the back porch at Garcia as he ran away. These actions alone were more than sufficient to establish his intent to kill, and that his conduct was premeditated, willful, and deliberate.

However, appellant's conduct following the shooting provided further evidence of his premeditated intent to kill. After Garcia fled, appellant armed himself with another rifle and continued to search for Garcia, commenting to his neighbor that he was searching for "that fat cop." While receiving medical treatment, he commented that Garcia was lucky he "didn't pull a fucking .45 on him." Then, when interviewed by law enforcement, he admitted he was shooting at Garcia to "take him out."

We also conclude that any inference of prejudice was significantly limited because much of the firearms evidence would still have been admitted even if defense counsel had

22.

objected. (See *People v. Davis* (2009) 46 Cal.4th 539, 603 [error in admitting prior crimes evidence was harmless because otherwise admissible]; see also *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049–1050 [inference of prejudice from admission of gang evidence dispelled where such evidence was otherwise relevant to issue of guilt].) Under Evidence Code section 1101, subdivision (b), "evidence that a person committed a crime, civil wrong or other act" is admissible where relevant to prove some other fact, such as identity, motive, or intent. Here, as the prosecutor argued to the trial court, appellant's extensive knowledge of firearms was relevant to establish his intent to kill, because it showed he had knowledge of the damage that a firearm, particularly, an assault rifle loaded with "fragmentation rounds," can do to a human being. Moreover, his prior statement to his neighbor that he would use firearms against law enforcement if they ever came on his property suggested his conduct was both intentional and premeditated, because it showed he had considered shooting at police officers in such a situation prior to his encounter with Garcia.

Considering the overwhelming evidence of guilt and the likelihood that some of the firearms evidence would still have been admitted over appellant's objection, it is not reasonably probable its admission impacted the result of appellant's trial. (*Sullivan v. Louisiana*, *supra*, 508 U.S. at p. 279.) Any presumed error was harmless, and this claim lacks merit.

**IV.     Appellant's Claim that the Prosecutor Misled the Jury by Using the Example of the Decision to Drive Through a Yellow Traffic Light to Explain Premeditation and Deliberation is Forfeited. In any Event, the Prosecutor's Argument was not Improper.**

During closing argument, to explain the extent of reflection necessary to establish premeditation and deliberation, the prosecutor used the analogy of the decision to drive through a yellow traffic light. The prosecutor stated:

> "Let's talk about first degree willful, premeditated, deliberate.
> When you come to a yellow light at an intersection, and you are driving up

to it, you approach the intersection, and then there's a yellow light, you have to make a decision. Do I stop, wait for it to turn red, or do I proceed through, and hope to get across before it turns red? That is the amount and time and type of choice and decision that amounts to premeditation [and] deliberation. It can be done in the shortest amount of time."

Appellant contends this analogy misled the jury by diminishing the extent of the reflection necessary to establish premeditation and deliberation. We conclude appellant forfeited the claim by failing to object below, and regardless, the prosecutor's argument was not misleading.

### A. Standard of review.

Prosecutorial misconduct occurs when "[a] prosecutor … uses deceptive or reprehensible methods to persuade the jury." (*People v. Parson* (2008) 44 Cal.4th 332, 359.) "When a claim of misconduct is based on the prosecutor's comments before the jury … ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.)

### B. The claim is forfeited.

Respondent contends appellant forfeited his claim of prosecutorial misconduct, by failing to raise a timely objection. We agree with respondent. "To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument." (*People v. Gonzales and Soliz*, *supra*, 52 Cal.4th at p. 305.) Appellant did not object at trial to the prosecutor's argument, and this was not the type of alleged error that could not have been cured by an admonition from the trial court. (See *People v. Hill* (1998) 17 Cal.4th 800, 820.) Accordingly, this claim is forfeited.

Appellant argues that if the claim is forfeited, it is because defense counsel was ineffective for failing to object. Because we exercise our discretion to address the merits of the prosecutorial misconduct claim, we need not consider the alternative ineffective

24.

assistance of counsel claim. (See *People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 92 [reaching merits because appellant also raised ineffective assistance of counsel claim]; *In re Victor L.* (2010) 182 Cal.App.4th 902, 928.)

### C. No prosecutorial misconduct occurred.

We reject appellant's assertion that the prosecutor's analogy to the decision to drive through a yellow light misled the jury as to the reflection necessary to establish premeditation and deliberation. As our Supreme Court has explained, " 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly...." [Citations.]' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) Consistent with these principles, the prosecutor's analogy highlighted that as with the decision to drive through a yellow light, premeditated and deliberate attempted murder may involve the weighing of several considerations in a short period of time.

In *People v. Avila* (2009) 46 Cal.4th 680, 715, the prosecutor used the same "yellow light" analogy. The Supreme Court concluded the argument was proper: "[T]he prosecutor used the example of assessing one's distance from a traffic light, and the location of surrounding vehicles, when it appears the light will soon turn yellow and then red, and then determining based on this information whether to proceed through the intersection when the light does turn yellow, as an example of a 'quick judgment' that is nonetheless 'cold' and 'calculated.' " Similarly, in *People v. Son*, which also involved the prosecutor's use of the "yellow light" analogy, the court concluded, "We see no error in the yellow light example. At least in the way the prosecutor framed it, if someone were to go through the decisionmaking process the prosecutor described, the decision to proceed through the intersection would be premeditated." (*People v. Son* (2020) 56 Cal.App.5th 689, 699.)

Considering these authorities, we conclude the prosecutor's analogy and argument correctly reflected the applicable law of premeditation and deliberation. Accordingly, the prosecutor did not mislead the jury, and there is no reasonable likelihood the jury misapplied the law. This claim is without merit.

## V. Appellant's Sentence on Count 2 and the Associated Firearm Enhancement must be Stayed Pursuant to section 654, subdivision (a).

At sentencing, the trial court sentenced appellant to the middle term of nine years on count 2, and the middle term of four years on the associated use of a firearm enhancement. The court ordered sentence on count 2 and the enhancement to be served concurrently to the sentence on count 1.[8]

Appellant contends the sentence on count 2 and the use of a firearm enhancement instead should have been stayed pursuant to section 654, subdivision (a), because they did not involve a separate act from count 1. Respondent concedes, and we agree. "Section 654 prohibits multiple punishment for a single physical act that violates different provisions of law." (*People v. Jones* (2012) 54 Cal.4th 350, 358.) There is no dispute the act of shooting at Garcia with an assault rifle formed the basis for both convictions and enhancements. Therefore, sentence on count 2 and the associated use of a firearm enhancement must be stayed pursuant to section 654. (See *People v. Smith* (1985) 163 Cal.App.3d 908, 914 [conduct enhancements relating to a stayed term must also be stayed].)

We also note that the determinate abstract of judgment incorrectly lists the code section for the firearm enhancement on count 2 as "PC 12022.53(c)." The amended

---

[8] The abstract of judgment incorrectly states the sentence on count 2 and the use of a firearm enhancement were ordered to run consecutive to the sentence on count 1. (See *People v. Walz* (2008) 160 Cal.App.4th 1364, 1367, fn. 3 ["When there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls."].)

determinate abstract of judgment shall list the correct code section—12022.5, subdivision (a).

## **DISPOSITION**

Appellant's sentence on count 2 and the associated use of a firearm enhancement are ordered stayed pursuant to section 654, subdivision (a).  The trial court is directed to prepare an amended determinate abstract of judgment reflecting this court's order.  The amended determinate abstract of judgment shall also list the correct code section for the firearm enhancement on count 2.  The trial court shall forward the amended determinate abstract of judgment to the appropriate authorities.  In all other respects, the judgment is affirmed.

LEVY, Acting P. J.

WE CONCUR:


POOCHIGIAN, J.


DE SANTOS, J.