[Cite as *State v. Scerba*, 2025-Ohio-2791.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | |
|---|---|
| STATE OF OHIO | : |
| | : C.A. No. 2024-CA-79 |
| Appellee | : |
| | : Trial Court Case No. 24-CR-564 |
| v. | : |
| | : (Criminal Appeal from Common Pleas |
| GENE FRANKLIN SCERBA | : Court) |
| | : |
| Appellant | : **FINAL JUDGMENT ENTRY &** |
| | : **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on August 8, 2025, the judgment of the trial court is reversed and remanded for further proceedings consistent with the opinion.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
MARY K. HUFFMAN, JUDGE

Tucker, J., and Hanseman, J., concur.

**OPINION**
CLARK C.A. No. 2024-CA-79

TRAVIS KANE, Attorney for Appellant
ROBERT C. LOGSDON, Attorney for Appellee

HUFFMAN, J.

**{¶ 1}** Gene Franklin Scerba appeals from his conviction for receiving stolen property. He had entered a no contest plea after the trial court overruled his motion to suppress evidence. Because we conclude that the trial court erred in overruling Scerba's motion to suppress, Scerba's conviction for receiving stolen property will be reversed, and the matter will be remanded to the trial court.

## Procedural History

**{¶ 2}** In July 2024, Scerba was indicted on one count of receiving stolen property (flowers from Home Depot). In August, he filed a motion to suppress the evidence that police officers had found in his pickup truck and his statements to the officers following an encounter in an alley. Specifically, he argued that there had been no legal justification for stopping and detaining him, searching him, or searching the truck. After a hearing, the court denied the motion to suppress. Scerba subsequently entered a plea of no contest. He was found guilty of receiving stolen property, was sentenced to eight months in prison, and was ordered to pay court costs.

## The Encounter with Police

**{¶ 3}** The following evidence was presented at the suppression hearing.

**{¶ 4}** Springfield Police Officer Greg Ivory encountered Scerba on July 1, 2024, at about 1:45 a.m., near a Speedway gas station. Ivory testified that the Speedway was in an area of Springfield in which police officers routinely perform "bulletin checks" and "visit

checks" because of recurring problems such as panhandling, drug trafficking, overdoses, prostitution, weapons concerns, and homeless encampments. He had been assigned to that area throughout his 22-year career with the Springfield Police Department, and he testified that he often initiated bulletin checks at that Speedway. He was also routinely called to that location because people often congregated on the south side of the gas station, where a privacy fence separates it from another business. Ivory described a 30-foot gap between the Speedway and the fence, which was somewhat open but contained dumpsters; the area can be seen from the Speedway parking lot, and an alley runs north and south through it. According to Ivory, all kinds of people come and go from and congregate at the Speedway at night, because it is one of the only places that is open.

{¶ 5} On July 1, Ivory noticed a group of people gathered on the south side of the Speedway near the dumpsters and privacy fence; one of these people was looking toward the alley, and Ivory looked in the same direction. Ivory saw a black truck "parked or stopped" in the alley. It appeared to Ivory that the truck was occupied by the driver and other individuals. Per his routine practice, Ivory circled the gas station "to make sure nothing else [was] going on," and he noticed several people "out back by this truck" between the dumpster and the privacy fence.

{¶ 6} According to Ivory, he had to enter his location into his cruiser's computer as part of initiating a bulletin check; while he did so, he continued to watch Scerba's truck. It was parked or stopped, with no lights on, near a "bunch of shrubbery" which somewhat concealed it. The truck began to move northbound in the alley, then stopped. The alley ends at North Street, where the only option is to turn left. Ivory testified:

> And . . . it's stopped in an alley on the north side of the business which, you know, all these other indicators are things that were going on, you know,

that could be potentially going on. So I decided to make it a point to drive out into North Street to be visible by the people in the truck, drive out onto - - back into the parking lot 'cause I was gonna come around, work my way around behind the truck that was in the alley.

{¶ 7} By the time Officer Ivory circled around, which took about a minute, the truck had started to make a U-turn in the alley and had turned into "the grassy field" of the business behind the Speedway. He stated that there were several people by the truck between the dumpster and the privacy fence. As Ivory pulled up near the truck to get the plate number, the driver (Scerba) stopped the truck and got out.

{¶ 8} Ivory testified that, in his experience, it is common for people to leave their vehicles if they have active warrants, and there are a lot of "officer safety issues" when drivers do so. Ivory had activated his cruiser's red overhead lights and started to get out of his patrol car. Ivory testified that, at that point, he was investigating why Scerba was driving the way he was, because he found it suspicious that Scerba was parking to block the alley. Ivory testified that Scerba wanted to walk southbound between Ivory's cruiser and the truck. Ivory ordered him to stop and "conducted a traffic stop." He used the cruiser's spotlight to see Scerba's hands "in case it was going to go sideways . . . ." Ivory testified that, in his experience, one of the red flags and reasons a person tends to quickly get out of a vehicle during a stop is that the person is carrying some sort of contraband; "[t]hey are distancing themselves from what is in the vehicle," or they "have warrants . . . [and] take off."

{¶ 9} Ivory patted down Scerba for weapons and felt a metal object, which he described as being in the shape of a firearm; he removed it from Scerba's pocket, handcuffed him, and waited for back-up. Ivory described Scerba as jittery, skittish, and sweating profusely. Ivory kept Scerba in front of his cruiser and in view of the vehicle's

camera, and Ivory stayed alert to whether anyone else from the south side of the business was coming toward him. At that point, Ivory still believed "multiple people" were in Scerba's truck, noting that the windows were very dark. Ivory testified that when he patted Scerba down, he was able to see the rear of the truck, where something was covered by a tarp, but he did not know what was under the tarp. He was 20 to 30 feet from the truck at the time, and he remained there because he did not want to "give somebody else the opportunity to hop out and run or take the vehicle or, God forbid, shoot us."

{¶ 10} When Officer Amanda Rosales arrived to assist Ivory, they quickly determined that the item Ivory had taken from Scerba's pocket was a lighter. Ivory then read Scerba his rights, which was within a minute or two of placing him in handcuffs. Scerba made no statements during this time, and he acknowledged understanding his rights. After Scerba was advised of his rights, Ivory asked him why he was soaking wet, and Scerba stated that he was wet from a sprinkler.

{¶ 11} Ivory told Rosales that he was not sure if anyone else was in the truck, and she "cleared the truck" for officer safety by opening the door. Ivory testified that what he had seen behind Scerba in the truck, which he initially believed to be another person or persons, turned out to be flowers on further inspection. At trial, a video was played from Officer Rosales's body camera, and Ivory identified on a video what appeared to be "a complete bed full of flowers" in the truck, with a tarp over them; he testified that the flowers still had their retail tags on them from Home Depot. Ivory did not touch the tarp until Scerba was in his cruiser "during the theft investigation." Ivory stated that he had planned to tow the vehicle because it was being used to commit a theft.

{¶ 12} According to Ivory, the basis for the "traffic stop" was that Scerba was "parked in the alley, blocking the alley" and then drove into the yard where the truck was stopped.

Ivory acknowledged that the alley was not a marked, paved road, and he was unsure if it was a public road. Ivory stated that the truck's movement drew his attention, because there were people standing outside the truck, talking to the driver. According to Ivory, such behavior is "synonymous with hand-to-hand drug transactions." Ivory acknowledged that he did not see anyone get in or out of the truck, just people talking to the driver outside the driver's door.

{¶ 13} Officer Rosales testified that on July 1, 2024, she had responded to a request for assistance by Officer Ivory regarding a suspicious male at the rear of the Speedway gas station, "and then it turned into a traffic stop." Rosales testified that, when she arrived at the scene with Ivory, Scerba's vehicle was stopped, he was outside of it, he was "in the process of being detained," and he was in handcuffs. She testified to her discovery of flowers "overwhelmingly everywhere" in the bed and cab of Scerba's truck. There were no people in the truck. Rosales subsequently drove to Home Depot to verify if a large number of flowers was missing. While she was there, she noticed that the sprinklers had been on to water the flowers. She and Ivory believed this possibly explained why Scerba was so wet. The officers were unaware of any report of a theft of flowers at that time.

{¶ 14} Officer Rosales's body camera video depicted her arrival at Speedway. When she arrived, Ivory and Scerba were standing in front of Ivory's cruiser, with the overhead lights on, and Scerba was in handcuffs. As she approached the truck, Ivory told Rosales that he was unsure if there were more people in the truck, but there were "probably one or two." Flowers were visible inside the cab of the truck, and there was a tarp in the rear bed. Rosales walked around the back of the truck, opened the passenger door, looked inside with a flashlight, and stated that no one else was there, just "stolen flowers." Flowers

were visible sticking out from the tarp on the passenger side of the truck bed. Ivory then stated that he had observed seven people in the area and Scerba driving the truck.

## Assignments of Error and Analysis

{¶ 15} Scerba asserts two assignments of error related to the denial of his motion to suppress. We will consider them together.

{¶ 16} In his first assignment of error, Scerba argues that the trial court erred in concluding that Officer Ivory had not conducted a "traffic stop" of his vehicle when Officer Ivory approached Scerba at his vehicle with his cruiser lights activated and, based on that conclusion, it also erred in not applying the legal standards applicable to a traffic stop. According to Scerba, the trial court failed to conduct any type of Fourth Amendment analysis, which was required under the circumstances.

{¶ 17} In his second assignment of error, Scerba argues that the trial court erred in concluding that his encounter with Ivory was consensual. Scerba asserts that he was immediately detained and handcuffed while walking away from his vehicle, which obviates any argument that the encounter was consensual. According to Scerba, the trial court found that the encounter was consensual, despite the fact that Officer Ivory immediately detained him, and it concluded that any Fourth Amendment analysis was unnecessary.

## Suppression Decision

{¶ 18} In overruling the motion to suppress, the trial court found that Scerba had voluntarily exited his parked vehicle, at which time Ivory and Scerba had a consensual encounter. The court determined that Ivory had not "stopped" Scerba's vehicle; he merely approached the "parked vehicle" in an area described as an alley, although the court acknowledged that Ivory had not known whether it was a private or public alley. The court concluded that the initial encounter did not raise Fourth Amendment concerns, citing *State*

*v. Ball,* 2010-Ohio-714 (11th Dist.). The court also found that Ivory had not ordered Scerba out of his truck; rather, Scerba exited and began walking away from the vehicle when Ivory approached.

{¶ 19} Based on several factors, the court further concluded that Ivory's stop and pat down of Scerba had been permissible. It noted that the encounter occurred "during the overnight hours" in a high-crime area, several people were around Scerba's truck, Ivory believed other individuals were inside the truck, and Ivory had observed Scerba driving down the alley without headlights. Scerba also exited the truck and began to walk away as Ivory approached. According to the court, under these circumstances, Officer Ivory was justified in briefly detaining Scerba to investigate possible criminal activity and in performing a protective pat down of Scerba for officer safety. This search yielded what was only later determined to be a lighter in the shape of a firearm. The court noted that "an investigatory detention allows officers to briefly stop and detain an individual for possible criminal activity," including a protective pat down for weapons, citing *Terry v. Ohio,* 392 U.S. 1 (1968).

{¶ 20} The court found that Officer Rosales could see that the cab of Scerba's truck was filled with flowers when she shined her flashlight inside. Rosales then opened the passenger side door and shined her flashlight in the vehicle, because of Officer Ivory's belief that there might be additional occupants in the vehicle. She shut the door once she had confirmed there were no other occupants. In addition to the flowers in the cab, the officers were able to see flowers under a tarp in the bed of the truck because there was no tailgate on the truck.

{¶ 21} The court characterized the initial look into the vehicle through the window and the look under the tarp in the back as "plain view" searches and stated that the "only real

question" was whether an illegal search occurred when Rosales opened the door of the truck to confirm there were no other occupants.

{¶ 22} The trial court noted that "under certain circumstances opening a car door to determine whether weapons were being deployed was a reasonable precaution," citing *State v. Lenoir*, 1995 WL 558791 (2d Dist. Sept. 20, 1995), Because Ivory believed other individuals were in the truck and had felt what he believed to be a weapon during the pat down of Scerba, the court concluded that Rosales was "only searching for occupants in the vehicle for officer safety, and not evidence of a crime." The court also observed that the officers had no indication at the time that the flowers had been stolen. Finally, the court found that there was no custodial interrogation, and that, after being placed into custody, Scerba was read his *Miranda* rights and made no additional statements.

### Standard of Review

{¶ 23} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Burnside*, 2003-Ohio-5372, ¶ 8, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). "An appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *State v. Hawkins*, 2019-Ohio-4210, ¶ 16. "Accepting those facts as true, the appellate court must then independently determine, as a matter of law and without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied." *State v. Isaac*, 2005-Ohio-3733, ¶ 8 (2d Dist.), citing *State v. Retherford*, 93 Ohio App.3d 586 (2d Dist. 1994). "The application of the law to the trial court's findings of fact is subject to a de novo standard of review." *State v. Turner*, 2015-Ohio-4612, ¶ 10 (2d Dist.).

**Police-Citizen Contact**

{¶ 24} "The Fourth Amendment to the United States Constitution, and Section 14, Article I of the Ohio Constitution, protect individuals from unreasonable searches and seizures conducted by police officers."  (Citations omitted.)  *State v. Ferguson*, 2020-Ohio-4153, ¶ 12 (2d Dist.).  The Fourth Amendment, however, is not implicated every time a police officer has contact with a citizen.  *State v. Taylor*, 106 Ohio App.3d 741, 747 (2d Dist. 1995), citing *California v. Hodari D.,* 499 U.S. 621 (1991).  "The United States Supreme Court has identified three categories of police-citizen contact to identify situations where the Fourth Amendment protections are implicated."  (Citation omitted.)  *State v. Crum*, 2009-Ohio-3012, ¶ 12 (2d Dist.), citing *Florida v. Royer*, 460 U.S. 491, 501-507 (1983).  These categories are: (1) consensual encounters; (2) investigatory detentions; and (3) seizures that are the equivalent of an arrest. *Taylor* at 747-749.   The first two are at issue in Scerba's case.

### 1.    Consensual Encounters

{¶ 25}  "Encounters are consensual where the police merely approach a person in a public place, engage the person in conversation, request information, and the person is free not to answer and walk away."  *Id.* at 747, citing *United States v. Mendenhall*, 446 U.S. 544, 553 (1980).  "The Fourth Amendment guarantees are not implicated in such an encounter unless the police officer has by either physical force or show of authority restrained the person's liberty so that a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter."  *Id.* at 747-48, citing *Mendenhall* at 554; *Terry*, 392 U.S. at 16, 19.   Once a person's liberty has been restrained, the encounter loses its consensual nature and falls into one of the other two categories.   *Id.* at 748.

{¶ 26} In determining that Scerba's interaction with Ivory was consensual, the court relied upon *Ball,* 2010-Ohio-714 (11th Dist.). In that case, Police Officer Simpson responded to a report of suspected drug activity in a white vehicle parked in the driveway of a house. The area was known for high drug and prostitution activity. *Id.* at ¶ 2. When he arrived, Simpson observed two individuals leaning into the passenger side of the white vehicle in a parking area behind the home. Another person was in the driver's seat, and the vehicle was not running. Upon observing Simpson, the two individuals next to the car immediately began to walk away. Simpson stopped them, and they were identified as a known drug dealer and a known prostitute and drug user. They provided inconsistent stories about the events taking place. *Id.* at ¶ 3, 15. While speaking to them, Simpson observed Ball lean forward toward the floorboard in the vehicle. *Id.* at ¶ 15. Ball produced identification, and Simpson observed an open beer bottle on the floor of the vehicle. *Id.* at ¶ 4. Two minutes after Simpson arrived, Sergeant Hoso appeared and chose to further investigate. In determining that Simpson's initial encounter with Ball was consensual, the Eleventh District determined:

> With respect to the location of the parked vehicle, Officer Simpson and Sergeant Hoso described it as a "driveway," "parking area," and "parking lot area." It is well-settled that "[a]n encounter may be consensual when a police officer approaches and questions individuals in or near a parked car." *State v. Staten*, 4th Dist. No. 03CA1, 2003-Ohio-4592, at ¶ 18. (Citations omitted.) Further, an encounter may be consensual "if it occurs on private property." *Id*.
>
> " ' "(N)o Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors—such as driveways, walkways, or similar passages."

LaFave, *Search and Seizure* (1978), at § 2.3 at pp. 322-23, as cited in *United States v. Reed* (8th Cir., 1984), 733 F.2d 492, 501.'   The Fourth Amendment 'protects people, not places,' and '(w)hat a person knowingly exposes to the public, even in his own home or office, is not the subject of Fourth Amendment protection.'   (Internal citation omitted).   *Katz v. United States* (1967), 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576." *State v. Lungs*, 2d. Dist. No. 22704, 2008-Ohio-4928, at ¶ 20.

Further, "[w]hen a police officer merely approaches a person seated in a parked car, no 'seizure' of the person occurs so as to require reasonable suspicion supported by specific and articulable facts."   *State v. Woodgeard*, 1st Dist. No. 01CA50, 2002-Ohio-3936, at ¶ 34. (Citation omitted.) A consensual encounter is not a seizure, therefore no Fourth Amendment rights are invoked.   *Florida v. Bostick* (1991), 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389.

*Id.* at ¶ 12-14.

{¶ 27} In our view, *Ball* is distinguishable from the facts of this case.   Scerba was not approached while he sat in his parked vehicle.   Officer Ivory activated the emergency lights and spotlight on his cruiser, "ordered" Scerba to "stop walking," and immediately patted Scerba down. The evidence does not indicate that Ivory initiated any conversation with Scerba or asked to see any identification, as in *Ball,* which would been more consistent with a consensual encounter.   Ivory also did not testify that Scerba was free to terminate the encounter and walk away.   Rather, the evidence suggested that Scerba lost his liberty at the outset of the encounter and that it was not a consensual encounter.

## 2.  Investigatory Detentions

{¶ 28} The second type of encounter is a "*Terry* stop" or an investigatory detention, which is more intrusive than a consensual encounter but less intrusive than a formal custodial arrest.  *Taylor,* 106 Ohio App.3d at 748 (2d Dist.).  "Unlike consensual encounters, an investigatory detention constitutes a seizure; therefore, Fourth Amendment protections are implicated in an investigatory detention."  (Citations omitted.)  *State v. Shern*, 2018-Ohio-5000, ¶ 13 (2d Dist.).  An individual is subject to an investigatory detention when, by means of physical force or show of authority, a reasonable person would have believed that he or she was not free to leave or was compelled to respond to questions. *State v. Lewis,* 2009-Ohio-158, ¶ 22 (2d Dist.), at ¶ 22, citing *Mendenhall,* 446 U.S. at 553, and *Terry* at 16 and 19.  In *Mendenhall*, the Supreme Court listed several factors that might indicate a seizure, including the display of a weapon by an officer, physical touching of the person, the use of language or tone of voice indicating that compliance with the officer's request might be compelled, and blocking the citizen's path, among others. *Mendenhall* at 554.

{¶ 29} During investigatory detentions, "police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot[.]" (Citations omitted.) *State v. Swift*, 2016-Ohio-8191, ¶ 10 (2d Dist.), citing *Terry*. Therefore, investigatory detentions do not violate the Fourth Amendment "as long as the police have a reasonable, articulable suspicion of criminal activity."  *State v. Ramey*, 2016-Ohio-607, ¶ 22 (2d Dist.), citing *Taylor* at 748-749, citing *Terry*.  "The determination whether an officer had reasonable suspicion to conduct a *Terry* stop must be based on the totality of circumstances 'viewed through the eyes of the reasonable and prudent police officer on the scene who

must react to events as they unfold.' " *State v. Hairston*, 2019-Ohio-1622, ¶ 10, quoting *State v. Andrews*, 57 Ohio St.3d 86 (1991). "An assessment of the totality of the circumstances 'does not deal with hard certainties, but with probabilities.' " *Id*., quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981). "The officer must have more than an inchoate hunch or suspicion to justify an investigatory stop." *State v. Belvin*, 2014-Ohio-3634, ¶ 8 (2d Dist.).

{¶ 30} "An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000), citing *Brown v. Texas*, 443 U.S. 47 (1979). However, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation" and, thus, the fact that a stop occurs in a high-crime area is a relevant contextual consideration in a *Terry* analysis. *Id*., citing *Adams v. Williams*, 407 U.S. 143, 144, 147-148 (1972).

{¶ 31} Evasive behavior is also a pertinent factor in determining reasonable suspicion. *Id*., citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975); *Florida v. Rodriguez*, 469 U.S. 1, 6 (1984); *United States v. Sokolow*, 490 U.S. 1, 8-9 (1989). "Unprovoked flight upon seeing police officers is a relevant consideration in determining whether the totality of the facts and circumstances are sufficiently suspicious to justify a *Terry* stop." *State v. Jordan*, 2006-Ohio-1813, ¶ 22 (2d Dist.), citing *Wardlow*. "While such a factor is not necessarily indicative of criminal behavior, and can be consistent with innocent conduct, *Terry* recognized that officers may briefly detain individuals to resolve ambiguity in their conduct." *Id*. "Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and

investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning." *Wardlow* at 124-125. Thus, "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Id*., citing *United States v. Cortez*, 449 U.S. 411, 418 (1981).

{¶ 32} A routine traffic stop initiated by a law enforcement officer, including one based upon a traffic infraction, constitutes a seizure within the meaning of the Fourth Amendment. *State v. Netter*, 2024-Ohio-1068, ¶ 14 (4th Dist.), citing *Whren v. United States*, 517 U.S. 806, 809-810 (1996). "Thus, a traffic stop must comply with the Fourth Amendment's general reasonableness requirement." *Id.,* citing *Whren.* "An officer's decision to stop a vehicle is reasonable when the officer has probable cause or reasonable suspicion to believe that a traffic violation has occurred." *Id.*, citing *Whren* at 810; *accord State v. Mays,* 2008-Ohio-4539; *Dayton v. Erickson*, 76 Ohio St.3d 3, 11-12 (1996).

{¶ 33} "Law enforcement tasks generally associated with traffic infractions include (1) determining whether to issue a traffic citation, (2) checking the driver's license, (3) determining the existence of outstanding warrants, (4) inspecting the vehicle's registration, and (5) examining proof of insurance." " 'These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.' " *Id.,* quoting *State v. Farrow*, 2023-Ohio-682, ¶ 14 (4th Dist.), citing *Rodriguez v. United States,* 575 U.S. 348, 355 (2015); *State v. Aguirre*, 2003-Ohio-4909, ¶ 36 (4th Dist.) (during a traffic stop, motorist may be detained for a period of time sufficient to issue a citation "and to perform routine procedures such as a computer check on the motorist's driver's license, registration, and vehicle plates").

{¶ 34} The record was very poorly developed at the suppression hearing, and the State did not file a responsive brief in this appeal. Officer Ivory's testimony suggested that he first suspected Scerba of traffic infractions, such as blocking the alley and operating his vehicle without lights, but also suspected other criminal activity, such as "hand-to-hand drug transactions."

{¶ 35} Regarding any suspected traffic violations, it is not clear how Scerba blocked the alley when he left his vehicle in the grassy area adjacent to the alley, and it is not clear if Scerba's lights were on or off when his vehicle was moving down the alley; the lights were apparently off when it was stopped, based on Ivory's testimony. Ivory was uncertain whether the alley was a public thoroughfare, and he testified that it was not marked with lanes or paved. He did not mention the presence of any other vehicles in the alley that were "blocked" by Scerba. Ivory also did not commence any of the tasks associated with routine traffic stops addressed to roadway safety, such as issuing a citation.

{¶ 36} Further, although the trial court found that the totality of the circumstances justified Officer Ivory's detention of Scerba "to investigate possible criminal activity," the record does not support such a conclusion. The record reflects that Ivory lacked reasonable, articulable suspicion to conduct a *Terry* stop (outside of the traffic infraction context) and instead acted merely on an inchoate hunch. Ivory was not responding to a specific complaint about Scerba's vehicle. It is undisputed that criminal activity frequently occurred in the area around the Speedway, including drug trafficking, overdoses, and weapons issues. However, the Speedway is also the only business in the area that serves customers during the overnight hours, and Ivory testified that people and vehicles regularly come and go and congregate there at night.

{¶ 37} Although Officer Ivory expressed concern that he believed other people were in the vehicle with Scerba, he did not explain the nature of this concern about a vehicle with more than one occupant. Ivory mentioned "all these other indicators . . . that were going on . . . that could be potentially going on," without defining them. Regarding people talking with Scerba from outside the truck, Ivory stated that such conduct is "synonymous with hand-to-hand drug transactions," but he acknowledged that he did not see anyone get into or out of Scerba's truck, and he did not testify that he observed anyone reach into or out of the vehicle.

{¶ 38} Ivory testified that Scerba "wanted" to walk south between his truck and Ivory's cruiser, which would have been toward the open Speedway. Such conduct was not obviously evasive or characteristic of flight; it was more in keeping with someone going about his or her business. Scerba immediately obeyed Ivory's show of authority and did not attempt to flee in his truck or on foot.

{¶ 39} In our view, *Ball*, 2010-Ohio-714 (11th Dist.)., on which the trial court relied, supports our conclusion that Ivory lacked reasonable suspicion of criminal activity when he stopped Scerba. In that case, an initial consensual encounter by Officer Simpson developed into an investigatory detention by Sgt. Hoso.

Sergeant Hoso testified [at the suppression hearing] that based on what Officer Simpson had relayed to him, he chose to further question appellant. Sergeant Hoso stated he was aware of the dispatch call regarding suspected drug activity from a white vehicle; two individuals were leaning into the white vehicle; appellant was the sole occupant of the white vehicle; an open container of alcohol was in the vehicle; and appellant was making furtive movements toward the floorboard of the vehicle. Sergeant Hoso also testified that this area was a high-crime area, and appellant's conduct of moving toward

the floorboard after an officer arrived at the scene is consistent with drug activity. . . .

*Id*. at ¶ 17. Under these circumstances, the Eleventh District found that Sergeant Hoso had a reasonable, articulable suspicion to justify further investigation.

{¶ 40} In Scerba's case, however, such reasonable, articulable suspicion to justify an investigatory detention was absent. Officer Ivory initiated the bulletin check, and he did not see anyone leaning or reaching into Scerba's vehicle or have any report of suspected drug activity. Although Scerba was in a high-crime area, he was also in the vicinity of an open convenience store and gas station where many other people were regularly present. He was not parked in a private driveway, and Ivory did not see him engaging in furtive movements or describe any other actions that he found to be consistent with drug activity. There were no open containers of alcohol or indicia of impairment. In our view, under the totality of the circumstances, the trial court erred in overruling Scerba's motion to suppress, because Scerba did not have a reasonable, articulable suspicion that criminal activity was afoot before detaining Scerba.

{¶ 41} Scerba's assignments of error are sustained. The judgment of the trial court is reversed, and the matter is remanded for the trial court to grant the motion to suppress and conduct further proceedings as appropriate.

TUCKER, J., and HANSEMAN, J., concur.